UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6273CR-HUCK

UNITED STATES OF AMERICA,

vs.

FREDERICK MASSARO,
    Defendant.
_____/



### *MOTION TO SUPPRESS EVIDENCE DERIVED FROM ILLEGAL ELECTRONIC SURVEILLANCE IN STATE PROCEEDING, REQUEST FOR EVIDENTIARY HEARING AND INCORPORATED MEMORANDUM OF LAW*

Comes now the defendant, through his undersigned counsel, and pursuant to the Fourth Amendment to the United States Constitution, hereby requests this Court to suppress all communications and evidence derived as a result of electronic surveillance conducted with regard to the defendant that occurred from a court authorized wiretap and which the government seeks to employ in its prosecution of the indictment herein and the defendant asserts:

### FACTUAL BACKGROUND

1.    The defendant was charged in a prosecution for various charges, including RICO conspiracy, homicide and homicide related charges, as well as various other substantive charges involved fraud, unlawful extensions of credit and such matters.

2.    Substantial amounts of testimony and/or evidence which the government used to obtain the Indictment, and which the government intends to introduce into evidence at the defendant's trial herein was obtained through the use of Court authorized wiretaps.



3. The initial order authorizing an interception was signed by the court through Judge Dimitrouleas on March 18, 2000, and authorized interception of several telephones involving Mr. Massaro's home, business and cell phone. Telephones of other persons were named in initial Order.

4. There were several extensions to the original Order authorized by Judge Dimitrouleas.

5. The Defendant is an aggrieved person under Title III as the Government has conceded in the Standing Discovery Order.

6. The communications were unlawfully intercepted in violation of Title III of the Federal Wiretap Law [18 U.S.C. §2518].

7. The applications and subsequent interception order are overboard beyond the statute and in derogation of the statute and the evidence obtained therefrom is illegal in that the government's allegations as to other investigatory techniques or procedures as required by Title III are insufficient as being stated in purely conclusary and boldfaced inflammatory terms or otherwise a boilerplate recitation without regard to underlying factual circumstances.

8. The information obtained through the unlawful interception of communications, and information derived therefrom which the government seeks to introduce at the trial of the defendant is inadmissible. By unlawful in this case, the Defendant submits the "wires" ought not have issued.

9. The affiant is an agent obviously trained and schooled in what is necessary to obtain a warrant. One need only look to Mr. Feisthammel's own recitations of his qualifications as well as the history of La Cosa Nostra to see that.

10. That from the publicity, statements, charges, and indeed the allegata of the application, the principal target of this entire warrant and investigation is mainly Fred Massaro, an

2

associate of Gambino Soldier Anthony Trentacosta and in the crew of Gambino Soldier Anthony Ruggiaro.

11.     The affidavit notes that numerous informants and confidential sources wore a body bug and had numerous recorded conversations with Fred Massaro. Too, the information detailed in the affidavit by Louis Maione, who fully detailed numerous background matters, [Affidavit, Exhibit One at pages 16-22], is information by one that is apparently in the "inner circle" of the operation. Further the affidavit details the operations of confidential sources one through five which illustrate that the agents had other persons working with and within the "Massaro infrastructure". The seventy plus body interception wires attest to this, and numerous consensual telephone intercepts were had and later a sixth confidential source at Trump Financial Group was aboard.

12.     The defendant seeks to have this Court declare the information thus obtained and any derivative information, illegally seized in violation of the authorizing statutes, and suppress if pursuant to Title 18 U.S.C. 2518(10)(a), as more particularly described in the Memorandum below as the wiretap was improperly ordered.

## MEMORANDUM OF LAW

The Federal Wiretap statute, requires that, prior to resorting to the interception of communications, the government must demonstrate the necessity of a wiretap by presenting the Court with a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous. The reason for such extensive judicial scrutiny in this area was expressed by the Supreme Court in Berger v. New York, 388 U.S. 41, 63 (1967), where the court recognized that "few threats to liberty exist which are greater than that posed by the use of eavesdropping devices". Id. Stated differently by the Second Circuit, "to guard against the realization of Orwellian fears and

3

conform to the constitutional standards for electronic surveillance operations elaborated in [e.g.] Katz v. United States, 389 U.S. 347 (1967) Congress enacted Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. Section 2510 et.seq." United States v. Marion, 535 F.2d 697, 698 (2 Cir 1976).

While ".....the courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than in a common sense manner", United States v. Ventresca, 380 U.S. 102 (1965), mere conclusions by the affiant are insufficient to justify issuance of a warrant. Aguilar v. Texas, 378 U.S. 108 (1964).

This maxim is even more compelling in dealing with an authorization to intercept communications. The constitutional tolerance of wiretap orders has been allowed only because of the precise requirements of the Act, and its provisions for close judicial scrutiny. United States v. Bobo, 477 F.2d 974 (4 Cir 1973). Further, it must be always borne in mind that there is a statutory presumption against granting a wiretap application which must be overcome by the government before the application is granted. United States v. Ippolito, 774 F.2d 1482 (9 Cir 1985).

In the instant case, the affidavit accompanying the wiretap application described the alleged difficulties encountered in utilizing more conventional investigatory techniques in the following:

4

## NORMAL INVESTIGATIVE TECHNIQUES

111    Your affiant is aware that an investigation consists of a number of techniques being used in conjunction with each other to develop enough evidence to establish a prosecutable case against all guilty individuals.  These techniques include the use of undercover agents, confidential sources, the testimony of witnesses before the Federal Grand Jury, surveillance, analysis of toll and pen register data, and the execution of search warrants.  The requested authorization for wire interception is necessary because these normal investigative techniques have been tried, and have not resulted in sufficient evidence to prosecute all the participants in the criminal enterprise.  Furthermore, these techniques appear unlikely to produce the needed results if attempted or utilized further, or they are too dangerous, as described below.

112    Your affiant is aware that ANTHONY RUGGIANO and ANTHONY TRENTACOSTA are soldiers in the Gambino LCN crime family.  Your affiant is also aware from prior investigations and reports of other agents that "made" members of LCN Crime families, such as RUGGIANO and TRENTACOSTA, typically use LCN associates, such as FREDERICK MASSARO, MICHAEL J. FALCO, ARIEL A. HERNANDEZ, JOHN PATRICK ROGAN, JULIUS BRUCE CHIUSANO, IRVING HAROLD WEISS, CHESTER POTASH, and RICHARD DAVID GAZIE, as insulation between themselves and outsiders. This buffer serves to protect the "made" member from direct dealings with undercover agents or confidential.

113    Your affiant is unaware of any undercover agents or cooperating witnesses who can infiltrate the conspiracy at a level high enough to identify all members of the conspiracy or otherwise satisfy all the goals of this investigation.

114    The use of confidential sources has been very valuable in developing information

5

pertaining to FREDERICK MASSARO, ANTHONY RUGGIANO, ANTHONY TRENTACOSTA, MICHAEL FALCO, ARIEL A. HERNANDEZ, JOHN PATRICK ROGAN, JULIUS BRUCE CHIUSANO, IRVING HAROLD WEISS, CHESTER POTASH, and RICHARD DAVID GAZIE, and their criminal activities. The cooperation of Maione, Engel, CS-1, CS-2, CS-3, CS-4, CS-5, CS-6 and CS-7 has significantly advanced the objectives of this investigation. However, even though Maione and Engel are willing to testify, they are not in a position to provide complete and continued details regarding the activities of this criminal enterprise.

115    Maione and Engel have previously cooperated in the prosecution against Nicholas Corozzo, Leonard DiMaria, and seven co-defendants. While Maione and Engel have known RUGGIANO, TRENTACOSTA, and MASSARO for many years, it has been several years since they have had any criminal association with RUGGIANO, TRENTACOSTA or MASSARO .

116    Only CS-1, CS-2 and CS-3 have ongoing associations with some of the listed principal interceptees. CS-4, CS-5, CS-6 and CS-7 are no longer available to work in an undercover capacity for the FBI, and are not known to have any current association with the listed interceptees. None of the confidential sources possess complete access to all the listed interceptees. Therefore, the confidential sources are not in a position to provide complete information regarding the criminal activities of those persons who comprise the enterprise under investigation herein.

117    Conducting physical surveillance of participants is a commonly used investigative technique. Surveillance has been conducted in this investigation and has assisted in disclosing some of the associations and places of meetings by the participants. However, this technique has failed to reveal the identity of all the participants and has failed to provide sufficient admissible evidence of specific criminal activities. Without knowledge of the content of these meetings, surveillance alone is of limited value. While surveillance can confirm the fact that a meeting took place, under

6

most circumstances it cannot provide the content of the discussions which facilitate the organization's illegal activities. Moreover, your affiant knows that the subjects herein are particularly sensitive to efforts to surveille their activities. On at least one occasion, when ROGAN was being surveilled by law enforcement agents, he actually confronted one of the agents who was following him.

118    Your affiant knows that any extensive surveillance risks exposure, and can compromise the covert nature of this investigation causing FREDERICK J. MASSARO, ANTHONY RUGGIANO, ANTHONY TRENTACOSTA, MICHAEL J. FALCO, MARTIN SISKIND, ARIEL A. HERNANDEZ, JOHN PATRICK ROGAN , JULIUS BRUCE CHIUSANO, IRVING HAROLD WEISS, CHESTER POTASH, RICHARD DAVID GAZIE, and their associates to alter and/or temporarily cease their criminal operations. continued surveillance of the residences and businesses of the principals would jeopardize the covert nature of the ongoing investigation, causing the participants to be more cautious and secretive about their ongoing criminal activity. However, surveillance, in conjunction with the interception of relevant conversations, will provide valuable evidence regarding the activities of those involved in this criminal enterprise.

119    The possibility of initiating a Federal Grand Jury investigation at this time into the illegal activities of the principals of this investigation has been considered. However, many of the possible witnesses are conspirators themselves, and there are presently not sufficient facts to determine which of the alleged conspirators, if any, should be or could be compelled to testify under a grant of immunity. Individuals who are members and associates of organized crime families often invoke their Fifth Amendment testimonial privilege, and even under a grant of immunity have been known to risk and accept contempt charges rather than testify. From your affiant's experience, as well as that of other Agents of the FBI experienced in organized crime matters, extensive overt

7

investigations would only result in the targets further camouflaging their activities, making detection even more difficult.

120    Consideration has been given to interviewing co- conspirators and associates of the principal subjects. However, the individuals who are knowledgeable of the criminal activities are generally participants in the crimes, and are therefore unwilling to provide information and testify. Even with the testimony of a co-conspirator, there would likely be insufficient evidence to successfully prosecute all co-conspirators or to develop usable information relating to the full scope of the federal violations set forth in this affidavit. The co- conspirators, in addition to being afraid of physical retaliation, are often themselves prior participants or currently involved in illegal activity, and as such refuse to cooperate with law enforcement to any significant degree. Even with the benefit of several key conspirators willing to testify, electronic surveillance is still necessary to accomplish successful prosecution because actual tape recordings of criminal conversations are usually necessary to corroborate testimony of witnesses with criminal backgrounds.

121    From prior investigations and reports of other Agents , your affiant knows that the Gambino LCN Crime family is extremely sophisticated in detecting and avoiding investigations by law enforcement agencies. This has made conventional investigative techniques, such as interviews, of very limited value.

122    Based upon your affiant's experience and the experience of fellow agents who have investigated organized crime activity, your affiant believes that interviews of additional co-conspirators or victims in this matter would be communicated to the principals, their subordinates, or others, who would take even more precautionary measures to avoid the further collection of evidence by law enforcement. Moreover, it is your affiant's belief that interviews with

co-conspirators at this stage of the investigation could jeopardize the safety of the confidential sources.

123    Telephone toll call records of telephones used by some of the known participants have been obtained. These records have been useful in revealing some of the associations and frequency of contact of the known participants with each other. However, these records, standing alone, do not provide proof of illegal activities because the records do not reveal the content of conversations. Pursuant to lawful court orders, pen registers and trap and trace techniques have been used in this investigation. As previously outlined in greater detail, the pen register information has revealed the existence of telephonic contact between the principals of this investigation, but like toll record information these records, standing alone, do not provide sufficient proof of illegal activities. The associations and frequency of contacts in themselves, do not provide evidence of criminal activity and do not identify the actual participants in the telephone contacts.

124    Based upon my experience, and the experiences of other law enforcement agents as related to me, it is my belief that use the of search warrants at this time would not provide sufficient evidence necessary to determine the full scope of the criminal conspiracies, the identity of all of the co-conspirators and the various methods used to run this criminal enterprise. Records concerning contacts between criminal associates are not normally kept, and the best evidence of a meeting would be the conversations themselves. Most such records are typically kept in a coded format, which is difficult to decipher absent the interception of relevant communications. Moreover, there is no corroborated information concerning the existence or location of any such records at this time.

The agent, after setting out all of the above, when juxtaposed to the vast information (including pen registers and the like) recites the following:

125    Due to the fact that sufficient evidence is not available through other investigative

9

techniques, as set forth above, your affiant believes there is a need for electronic surveillance in this matter to fully reveal the manner and scope in which FREDERICK J. MASSARO, ANTHONY RUGGIANO, ANTHONY TRENTACOSTA, MICHAEL J. FALCO, MARTIN SISKIND, ARIEL A. HERNANDEZ, JOHN PATRICK ROGAN, JULIUS BRUCE CHIUSANO, IRVING HAROLD WEISS, CHESTER POTASH, RICHARD DAVID GAZIE, the named interceptees, and others as yet unknown, are involved in the violations of federal statutes as set forth in paragraph 4 of this affidavit.

The contention of the Government, through its affidavit, is that its agent had tried several investigative methods during the course of their investigation, but that:

1.    the investigation had gone as far as it could, and

2.    the government had insufficient evidence to proceed to indictment.

Both contentions are obvious not correct considering the voluminous information possessed.

At the time the Affidavit for the initial wiretap was submitted to Judge Dimitrouleas, the government had obtained information through conventional investigatory means that was as complete an investigation as could be had.

In essence, this is an investigation that the government felt was such a "failure" that it must resort to the most stringently controlled weapon in its considerable arsenal.....wiretapping. Yet, at the moment this application was being submitted to Judge Dimitrouleas, who was to order the interception, the government had more than enough evidence to obtain indictments against the principals, and, most likely, considering the wealth of information and witnesses enough to obtain convictions certainly it had enough probable cause to obtain search warrants for homes and businesses. Nevertheless, in an excess of zeal, and in an effort to make what was already a distinct probability into a sure thing, the application was submitted. For that reason alone, the interception

10

is fatally flawed.  A careful analysis of the alternative investigative procedures entitled "Normal Investigative Techniques".

The Second Circuit has expressed the importance of this requirement as follows:

> We would flout the statutory intent that wiretaps be used only if necessary, were we to sanction a wiretap simply because the government pursued some "normal" investigative strategies that were unproductive when more fruitful investigative methods were available.  In effect, the government would be able to secure a wiretap in every case, even where a normal strategy would be likely to achieve the same result without resort to the serious intrusion that a wiretap necessarily entails.  <u>United States v. Ippolito</u>, 774 F.2d at 1486.

The reasons given for the authorization of a wiretap were nothing more than a boilerplate recitation of the necessity of a wiretap.  The techniques mentioned in the affidavit that were either employed or discarded did not contain ample reasoning as to why these measures either were not or would not be effective.

What is particularly significant about the affidavit in the instant case, is the obvious extreme success of the investigation up until the request for the wiretap due to the numerous confidential sources dealing with and recording Massaro and others.  Indeed this investigation could have continued for weeks or months along conventional roads, and then have search warrants issue, as was later done.

This is, it is submitted, a perfect example of how the affiant carefully phrased the affidavit in order to win the approval of the court.  Surely he knew that the courts have been more willing to grant wiretap applications where the Government was unable to gain access to the "inside" of the organization under investigation.  Yet again, as a close reading of the affidavit shows, that was not the case herein.

11

In <u>United States v. Van Horn</u>, supra, in upholding the wiretap application, the Eleventh Circuit agreed with the affiant, and discussed at length, that one reason why the wiretap was necessary was because in this case, the government was unable to penetrate the drug organization under investigation. <u>Id</u>. at 1497. Because of the dangerous nature of this particular drug conspiracy, the affidavit stated that it would be too dangerous for undercover agents to attempt to gain introduction in the "ringleader". <u>Id</u>. Further, in this case, it was deemed t have been virtually impossible to have determined the roles of the various co-conspirators. <u>Id</u>.

The Third Circuit also found that the Government had established that a wiretap was necessary, in this case, to investigate judicial corruption. <u>United States v. Vento</u>, 533 F.2d 838 (3 Cir 1976). In <u>Vento</u>, again, a recognized reason for granting the wiretap was because an undercover agent was unable to obtain a close working relationship with a person under investigation. <u>Id</u>. at 848.

Unlike these cases, in the instant case, the affiant <u>was</u> fortunate enough to have been able to have numerous informants maintain a close and confidential relationship with a principal member of the alleged conspiracy.

The agents had six confidential informants, other witnesses were talking freely. <u>Numerous</u> consensually received conversations occurred in person and over the phone. Toll records were obtained, surveillances were had, victims had come forward. An indictment certainly could have been had, however the Government chose not to indict but rather to seek to obtain a wiretap.

It is maintained in the affidavit, for example, that continued surveillance would be ineffective. The Eleventh Circuit recently upheld an application of a wiretap, where one of the basis for this decision was the obvious difficulty of surveillance. <u>United States v. Carranza</u>, 921 F.2d 1557. In <u>Carranza</u>, physical surveillance was attempted on at least 49 occasions, despite the

12

existence of counter surveillance measures such as high walls surrounding the area, and the use of cameras. Such was not the case in this instance.

The Ninth court also upheld an affidavit where physical surveillance was presented in the affidavit as nearly as impossible. U.S. v. Kerrigan, 514 F.2d 35 (9 Cir 1975). In this case, the affidavit was found to have amply demonstrated the necessity for a wiretap where the area that was to be observed was surrounded by a 5' fence topped with barbed wire, and 2 large dogs patrolled the area. Id. at 38.

While finding this, among other supporting factors factually sufficient to support the necessity requirement of the wiretap the court did take the opportunity to point out that "we agree with appellants that the boilerplate recitation of the difficulties of gathering usable evidence in bookmaking prosecutions is not a sufficient basis for granting a wiretap order. To hold otherwise would make [the federal wiretap necessity requirement] a merely formality in bookmaking cases". Id.

Distinguishable from both Carranza and Karrigan, supra, in the instant case, the affiant has not presented such convincing reasons as to why surveillance measures could not have been accomplished.

The affiant in the instant case also states, without any supporting facts but rather only his speculations, that it is his belief that the execution of a search warrant "would not provide sufficient evidence necessary to determine the full scope of the criminal conspiracies...", as fully set out above. These are again conclusions without a supportive factual basis.

The feasibility of a search warrant was addressed by the Ninth Circuit in U.S. v. Kalustian, 529 F.2d 585 (9 Cir. 1976). In this case, the affiant stated in the affidavit that "my experience and the experience of other agents has shown that gambling raids and searches of gamblers and

13

gambling establishments have not, in the past, resulted in the gathering of other evidence to prove all elements of the offense. I have found through my experience and the experience of other Special Agents who have worked on gambling cases, that gamblers frequently do not keep permanent records. If such records have been maintained, gamblers, immediately prior to or during a physical search, sometimes destroy the records. Additionally, records that have been seized in past gambling cases has generally not been sufficient to establish elements of federal offenses because such records are difficult to interpret, and many times are of little or no significance without further knowledge of the gamblers' activities". Id. at 588.

The court found that his recitation was insufficient to justify the granting of a wiretap. The Appellate Judges recognized that wiretaps are constitutional only because they call for close and continual judicial scrutiny. By insufficiently demonstrating why a wiretap is necessary, the court is "handicapped" in performing its oversight function. Id. at 590. The affiant in this case did not "enlighten [the court] as to why this gambling case presented any investigative problems which were distinguishable in nature or degree from any other gambling case. In effect the government's position is that all gambling conspiracies are tough to crack, so the government need show only the probability that illegal gambling is afoot to justify electronic surveillance. Title III does not support that view. Id. at 589.

Like in Kalustian, supra, the affidavit in the instant case states that a search would prove unsuccessful. Yet, it does not state any reasons why it would be unsuccessful. Much like the Kalustian affidavit, in the case at bar, the affidavit contains only unacceptable blind conclusions regarding the ineffectiveness of investigatory measures, that could easily be inserted and utilized in any affidavit supporting a wiretap. As stated by the Eleventh Circuit, "the affidavit must show

14

with specificity why in this particular investigation ordinary means of investigation will fail". U.S. v. Carrazana, 921 F.2d at 1565.

In that same vein, in United States v. Curreri, 388 F.Supp. 607 (U.S.D.C. Md. 1974), a wiretap was denied because its affidavit contained insufficient factual allegations. The court pointed out that the trial court "could not simply take judicial notice of the inherent difficulty of a gambling investigation", thus, issue a wiretap based on a conclusary affidavit. Id. at 622. This is because a wiretap is not issued in every gambling case, and this, the court stated, is the reason we have a necessity requirement under the federal wiretapping statute. Id. See also: United States v. Ventresa, 380 U.S. 102 (1965), [the issuing magistrate must properly perform his function and not "serve merely as a rubber stamp for the police"].

Because the affiant was in fact able to successfully get inside the inner workings of the organization through normal investigatory purposes, the use of a wiretap was unnecessary. See State v. Birs, 394 So.2d 1054 (Fla 4 DCA 1981), and United States v. Lilla, 699 F.2d 99 (1983).

In Lilla, where normal investigative techniques into drug offenses were successful, the court refused to issue a wiretap. Id. In that case, prior to the application for a wiretap, an undercover officer was able to "make a buy" and gain extensive information about those involved. Id. at 104. The court agreed with the defendant that a wiretap was unnecessary here, because conventional investigatory methods were successful. In fact, the court opined that to grant a wiretap based on the general conclusory affidavit presented would have been "a needless invasion of privacy".

The Defendant Massaro avers that that is the situation presented to the Court. The Government had all the facts necessary to proceed; it also had an unusual amount of information and resources available, but the Government sought the most intrusive least "work intensive" way available, intercepting private conversations.

15

The warrant should be found unable to pass constitutional muster and be quashed and all evidence suppressed.

WHEREFORE the Defendant requests this Motion be granted.

I HEREBY CERTIFY that a true and correct copy of the foregoing was furnished to the following parties listed below, this _____ day of January, 2001.

HADDAD & HESTER, P.A.
One Financial Plaza, Suite 2612
Fort Lauderdale, Florida 33394
[954] 467-6767

By: _____
FRED HADDAD
Florida Bar No. 180891

## CERTIFICATE OF SERVICE

Jeffrey H. Sloman, Esq.
Office of the United States Attorney
500 E. Broward Blvd., 7th Floor
Fort Lauderdale, Florida 33394

Larry LaVecchio, Esq.
Office of the United States Attorney
500 E. Broward Blvd., 7th Floor
Fort Lauderdale, Florida 33394

Richard Houlihan, Esq.
300 Aragon Avenue, Suite 310
Coral Gables, Florida 33134

Samuel Deluca, Esq.
3451 John F. Kennedy Blvd.
Jersey City, New Jersey 07307

Jeffrey Weinkle, Esq.
1035 N.W. 11th Avenue
Miami, Florida 33136

16

Donald Spadero, Esq.
1000 S. Federal Highway, Suite 103
Fort Lauderdale, Florida 33316

Michael Smith, Esq.
633 S.E. 3rd Street, Suite 4F
Fort Lauderdale, Florida 33301

Alejandro Taquechel, Esq.
3750 W. 16th Avenue, Suite 238
Hialeah, Florida 33012

Thomas Almon, Esq.
321 N.E. 26th Street
Miami, Florida 33137

Manuel Gonzalez, Esq.
782 N.W. Le Jeune Road, Suite 440
Miami, Florida 33126

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA


IN THE MATTER OF THE APPLICATION    )
OF THE UNITED STATES OF AMERICA     )    NO. *99-1-WPD*
FOR AN ORDER AUTHORIZING THE        )
INTERCEPTION OF WIRE COMMUNICATIONS )    UNDER SEAL
_____ )

## AFFIDAVIT IN SUPPORT OF APPLICATION

I, Terry L. Feisthammel, Special Agent, Federal Bureau of Investigation, Miami, Florida, being duly sworn, depose and say:

1    I am a Special Agent of the Federal Bureau of Investigation (FBI).  As such, I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code (U.S.C.), Section 2510 (7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, U.S.C., Section 2516.

2    I have been employed as a Special Agent of the FBI for approximately twelve years.  For the past three years, I have been assigned primarily to investigations of organized crime, including investigations of an organized criminal enterprise known as the La Cosa Nostra (LCN).  As a result of my participation in these investigations, conversations with other FBI Agents familiar with the criminal activities of the LCN, reviews of reports concerning

LCN activities, members and associates, and reliable informant information, I know that the criminal activities of the LCN include, but are not limited to, gambling, trafficking in contraband cigarettes, loansharking, money laundering, extortion, labor racketeering, drug trafficking, and murder. I have also become familiar with many of the methods used by the LCN in the commission of these offenses.

3    This Affidavit is being submitted in support of an application which seeks an order authorizing the interception of wire communications of **FREDERICK J. MASSARO, ANTHONY RUGGIANO, ANTHONY TRENTACOSTA, MICHAEL J. FALCO, MARTIN SISKIND, ARIEL A. HERNANDEZ, JOHN PATRICK ROGAN, JULIUS BRUCE CHIUSANO, IRVING HAROLD WEISS, CHESTER POTASH, RICHARD DAVID GAZIE, JOHN MIRABILE, ANTHONY ESPERTI, JOSEPH SPITALERI** (hereinafter referred to as the named interceptees) and others yet unknown occurring over cellular telephone number **(954) 224-7513** (bearing electronic serial number "ESN" **E0F91087**) and cellular telephone number **(954) 224-7512** (bearing ESN **EB8BD944**), each target cellular telephone number being subscribed to **FATHER & SON MOVING & STORAGE**, 6805 Stuart Ln S., Jacksonville, Florida, with the subscriber records listing the service user as **FRED MASSARO**; telephone number **(954) 456-3020**, subscribed to **FREDERICK J. MASSARO** at 1499 Shoreline Way, Hollywood, Florida; and business telephone number **(305) 944-2929**, subscribed to Beachside Mario's at 17210 Collins Avenue, Sunny Isles Beach, Florida, for a period of thirty (30) days. These four

target telephones have been identified as being utilized by **FREDERICK J. MASSARO.**

4    The wire interceptions sought herein will be conducted pursuant to Title 18, United States Code, Section 2518, concerning the following offenses enumerated in Title 18, United States Code, Section 2516:

A.    Conspiracy to conduct and participate, and conducting and participating, directly and indirectly in the affairs of an enterprise, as defined in Title 18, United States Code, Section 1961(4), i.e., the Gambino La Cosa Nostra (LCN) Organized Crime Family, the activities of which affect interstate and foreign commerce, through a pattern of racketeering activity which includes the offenses set forth in paragraphs 4(B) through 4(G) below, and through the collection of an unlawful debt, in violation of Title 18, United States Code, Section 1962(c) and (d);

B.    A felony violation relating to the production of false identification documents, in violation of Title 18, United States Code, Section 1028;

C. Fraud and related activity in connection with access devices, in violation of Title 18, United States Code, Section 1029;

D.  Mail Fraud and Wire Fraud, in violation of Title 18, United States Code, Sections 1341 and 1343;

E.    Making extortionate extensions of credit, financing extortionate extensions of credit and conspiring to collect

3

extensions of credit by extortionate means, in violation of Title 18, United States Code, Sections 892, 893 and 894;

F. Conspiracy to distribute and possess with intent to distribute a controlled substance, and distribution and possession with the intent to distribute a controlled substance, in violation of Title 21, United States Code, Sections 841 and 846;

G. Use of a communication facility in facilitating a narcotics offense, in violation of Title 21, United States Code, Section 843(b); and

H. Conspiracy to commit any or all of the aforesaid offenses set forth above in paragraphs 4(B), 4(C), 4(D) and 4(G), in violation of Title 18, United States Code, Section 371.

5    I base this affidavit upon information I have discovered through my personal participation in this investigation, from oral and written reports made to me by other agents of the FBI and other federal, state, and local law enforcement agencies, I am familiar with the facts and circumstances of the investigation.    In addition, I have reviewed numerous FBI and  Drug Enforcement Administration (DEA) investigative reports concerning information provided by confidential informants, cooperating witnesses, and surveillances.    These investigations have been ongoing since approximately October 1995.  These reports, in part, summarize the numerous meetings or telephone conversations among one or more of the principal interceptees of this investigation.

6    Since this affidavit is being submitted for the limited purpose of securing authorization for the interception of wire

4

communications, I have not included each and every fact known to me concerning this investigation. I have only set forth those facts believed to be necessary to establish the requisite foundation for the issuance of the order requested herein.

7    The facts and circumstances of this affidavit as set forth below demonstrate that:

A.    There is probable cause to believe that **FREDERICK J. MASSARO, ANTHONY RUGGIANO, ANTHONY TRENTACOSTA, MICHAEL J. FALCO, MARTIN SISKIND, ARIEL A. HERNANDEZ, JOHN PATRICK ROGAN, JULIUS BRUCE CHIUSANO, IRVING HAROLD WEISS, CHESTER POTASH, RICHARD DAVID GAZIE, JOHN MIRABILE, ANTHONY ESPERTI, JOSEPH SPITALERI** and others as yet unknown, have committed, are committing and will continue to commit the offenses enumerated hereinabove in paragraphs 4(A) through 4(H).

B.    There is probable cause to believe that **FREDERICK J. MASSARO, ANTHONY RUGGIANO, ANTHONY TRENTACOSTA, MICHAEL J. FALCO, MARTIN SISKIND, ARIEL A. HERNANDEZ, JOHN PATRICK ROGAN, JULIUS BRUCE CHIUSANO, IRVING HAROLD WEISS, CHESTER POTASH, RICHARD DAVID GAZIE, JOHN MIRABILE, ANTHONY ESPERTI, JOSEPH SPITALERI** and others as yet unknown, have used, are using, and will continue to use telephone numbers (954) 224-7513, (954) 224-7512, (954) 456-3020, and (305) 944-2929 for the purpose of facilitating the offenses enumerated hereinabove in paragraphs 4(A) through 4(H).

8    In particular, I believe that wire communications will occur over the target telephones (954) 224-7513, (954) 224-7512, (954) 456-3020 and (305) 944-2929 which will disclose:

A.    The precise nature and scope of the illegal activities.

B.    The disposition of proceeds of these illegal activities; and

C.    The location of resources and operations leading to the discovery of the identities of other co-conspirators, aiders and abettors, and victims, and the role of each participant in the conspiracies and in the substantive violations set forth hereinabove in paragraph 4.

D.    In addition, the wire communications are expected to constitute admissible evidence of the commission of the above-enumerated offenses.

9    Normal investigative procedures have been tried and have not fully succeeded in achieving the objectives of the investigation, or reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ.    These investigative procedures are discussed more fully below.

## DESCRIPTION OF FACILITIES
## TO BE INTERCEPTED

10    AT&T Wireless telephone records reveal that cellular telephone number (954) 224-7513 (bearing ESN E0F91087) and cellular telephone number (954) 224-7512 (bearing ESN EB8BD944) are each subscribed to FATHER & SON MOVING & STORAGE, 6805 Stuart Ln S., Jacksonville, Florida, with the subscriber records listing the service user as FRED MASSARO.    BellSouth Telecommunications records indicate that telephone number (954) 456-3020 is subscribed to FREDERICK J. MASSARO at 1499 Shoreline Way, Hollywood, Florida.

BellSouth Telecommunications records indicate that telephone number (305) 944-2929 is subscribed to Beachside Mario's at 17210 Collins Avenue, Sunny Isles Beach, Florida. Florida Corporate Comprehensive Report listed this business as Mario's of North Miami Beach, Inc., 17210 Collins Avenue, North Miami Beach, Florida. The Corporate Director of Mario's of North Miami Beach is identified as Pacita T. Mosher; date of birth, October 3, 1950; residential address, 1499 Shore Line Way, Hollywood, Florida. It is noted that both MASSARO and Mosher use the same residential address. Surveillance conducted on several occasions has documented MASSARO acting in a managerial capacity at Beachside Mario's.

11    There is probable cause to believe that particular wire communications of **FREDERICK J. MASSARO, ANTHONY RUGGIANO, ANTHONY TRENTACOSTA, MICHAEL J. FALCO, MARTIN SISKIND, ARIEL A. HERNANDEZ, JOHN PATRICK ROGAN, JULIUS BRUCE CHIUSANO, IRVING HAROLD WEISS, CHESTER POTASH, RICHARD DAVID GAZIE,** and others yet unknown, who are engaged in the offenses enumerated in paragraphs 4(A) through 4(G) will be obtained through the interception of wire communications occurring over telephone numbers (954) 224-7513, (954) 224-7512, (954) 456-3020, and (305) 944-2929.

## BACKGROUND OF THE PRINCIPALS

12    FREDERICK J. MASSARO, a/k/a "Freddie Massaro," was born on October 20, 1939 and resides at 1499 Shoreline Way, Hollywood, Florida. MASSARO is an Associate of Gambino soldier ANTHONY TRENTACOSTA and in the crew of Gambino soldier ANTHONY RUGGIANO.

In one conversation which occurred between Gambino Caporegima Nicholas Corozzo and a Cooperating Witness, and which was overheard by agents of the FBI, Corozzo indicated that he was upset because MASSARO had not sent the expected percentage of the proceeds from criminal activity to Nicholas Corozzo's brother, Joseph Corozzo. Nicholas Corozzo stated that he had sent MASSARO to New York to straighten out this matter. Numerous surveillances have documented MASSARO meeting with TRENTACOSTA. Confidential source information indicates that MASSARO has had hidden ownership interests in adult entertainment clubs. In addition to numerous arrests, MASSARO was convicted in the 13th Judicial Circuit of Florida, on June 25, 1985, of passing forged instruments (five counts).

13  **ANTHONY RUGGIANO**, a/k/a "Fat Andy," was born on August 16, 1926, and resides in New York. RUGGIANO is currently a soldier in the Gambino LCN Organized Crime Family and supervises crews that conduct criminal activities in New York and South Florida. In addition to numerous arrests, RUGGIANO has the following convictions: March 3, 1948, Brooklyn, New York, Burglary; July 30, 1979, Suffolk County, New York, Criminal Contempt; June 25, 1987, Miami, Florida, Racketeering - Making Extortionate Extension of Credit, Collecting Extensions of Credit by Extortionate Means, Interference with Commerce by Threats of Violence, Interstate/Foreign Travel in Aid of Racketeering, and Prohibited Racketeering Activities, for which he was sentenced to 17 years

incarceration. RUGGIANO was released from custody on May 24, 1997, and was placed on parole until May 23, 2024.

14    **ANTHONY TRENTACOSTA**, a/k/a "Tony Pep," was born on August 22, 1939. TRENTACOSTA resides in Atlanta, Georgia and is a soldier in the Gambino LCN Organized Crime Family, supervising crews that conduct criminal activities in Atlanta, Georgia and South Florida. Confidential source information and surveillances establish that TRENTACOSTA travels to the South Florida area on a monthly basis. In addition to numerous arrests, TRENTACOSTA was convicted on January 25, 1974 in Brooklyn, New York of Theft from Interstate Shipments.

15    **MICHAEL J. FALCO**, a/k/a "Michael Muro," was born on October, 17, 1932, and resides at 6701 N.W. 169th Street, Apartment B-301, Miami, Florida. Pen register records on the four target telephones utilized by FREDERICK MASSARO indicate numerous calls to and from all four target telephone numbers and FALCO's residence. In addition to numerous arrests, FALCO was convicted on March 3, 1962 in Miami, Florida for Uttering Forged Instruments.

16    **MARTIN SISKIND**, a/k/a "Marty Siskind," was born on July 6, 1941. Pen register records on the four target telephones utilized by FREDERICK MASSARO indicate numerous calls to and from all four target telephone numbers and SISKIND's cellular telephone. SISKIND was convicted on May 13, 1991 in Broward County, Florida for Grand Theft and Resisting Arrest without Violence.

17    **ARIEL A. HERNANDEZ** was born July 10, 1965. As set forth hereinbelow, Confidential Source information indicates that Massaro

9

and Hernandez are conspiring to obtain victim bank account information in order to produce forged personal checks and identification documents in order to cash forged checks. Hernandez has the following convictions: January 14, 1986, Miami, Florida, Aggravated Assault; January 17, 1992, Miami, Florida, Credit Card Fraud.

18     JOHN PATRICK ROGAN was born on June 3, 1967, and resides at 341 S.W. 182nd Way, Hollywood, Florida. Previous investigations conducted by the FBI and DEA have established that ROGAN is married to the daughter of the woman who lives with FREDERICK MASSARO. Confidential source information indicates that ROGAN has a business interest in Wesley's Sports Bar, 15346 West Dixie Highway, North Miami, Florida. Surveillance agents have placed ROGAN at Wesley's Sports Bar. Pen register records for the four target telephones indicate calls to and from Wesley's Sports Bar (305) 945-9053 and all four target telephone numbers. ROGAN has the following convictions: October 23, 1987, Dade County, Florida, Drug possession, drug trafficking, possession of narcotics equipment, and dealing in stolen property; November 10, 1988, Miami, Florida; resisting arrest with violence.

19     JULIUS BRUCE CHIUSANO, a/k/a "Bruce Chiusano," was born on June 29, 1948. Pen register records on the four target telephones utilized by FREDERICK MASSARO indicate numerous calls to and from all four target telephone numbers and CHIUSANO's cellular telephone. CHIUSANO does not have a criminal history.

10

20   **IRVING HAROLD WEISS,** a/k/a "Irving Weiss," was born on January 30, 1939. Pen register records on the four target telephones utilized by FREDERICK MASSARO indicate numerous calls to and from target telephone numbers (305) 944-2929, (954) 456-3020 and (954) 224-7512 and WEISS' cellular telephone. WEISS does not have a criminal history to the best of my knowledge.

21   **CHESTER POTASH** was born on August 16, 1934. POTASH does not have a criminal history to the best of my knowledge.

22   **RICHARD DAVID GAZIE,** a/k/a "Dick Gazie," was born on September 19, 1926. GAZIE was arrested on January 18, 1981 in Fort Lauderdale, Florida for Procurement of a Prostitute; the disposition of this charge was sealed by the Broward County court on September 23, 1981. GAZIE was also arrested on May 17, 1991 by the Broward County Sheriff's Office for Solicitation of Prostitution; the disposition of this charge is not available.

23   **JOHN MIRABILE,** a/k/a "Johnny Boy," was born on March 24, 1961. MIRABILE resides in New York and is a soldier in the Bonanno LCN Organized Crime Family, supervising crews that conduct criminal activities in New York and South Florida. MIRABILE was convicted on December 15, 1993 in Brooklyn, New York for Possession of Forged Securities. Pen register records on the four target telephones utilized by FREDERICK MASSARO indicate nine telephone calls to and from target telephone numbers (954) 224-7513 and (305) 944-2929 and MIRABILE's cellular telephone.

24   **ANTHONY ESPERTI,** a/k/a "Tony Esperti," was born on August 6, 1932. MIRABILE resides in Pembroke Pines, Florida and is an

11

associate of the Colombo LCN Organized Crime Family.  In addition to numerous arrests, ESPERTI has the following convictions: 1959, Riverhead, New York, Unlawful Entry; 1965, Miami, Florida, Conspiracy to Commit Extortion; 1967, Miami, Florida, Hobbs Act violation; 1974, Lake Butler, Florida, First Degree Murder; and 1983, Miami, Florida, Escape.  Pen register records on the four target telephones utilized by FREDERICK MASSARO indicate numerous calls to and from all four target telephone numbers and ESPERTI's residence.

25    JOSEPH F. SPITALERI, a/k/a "Joe Spit," was born on May 28, 1954.  SPITALERI resides in South Florida and is affiliated with MASSARO.  Pen register records on the four target telephones utilized by MASSARO indicate numerous calls to and from all four target telephone numbers and SPITALERI's cellular telephone.  In addition to numerous arrests, SPITALERI was convicted on December 13, 1984 in Miami, Florida for felony drug possession.

## PREVIOUS APPLICATIONS

26    I caused a search to be made of the Electronic Surveillance Indices of the Federal Bureau of Investigation and the Drug Enforcement Administration during the week of February 8, 1999 in order to determine whether previous applications have been made to intercept wire, oral or electronic communications of **FREDERICK J. MASSARO, ANTHONY RUGGIANO, ANTHONY TRENTACOSTA, MICHAEL J. FALCO, MARTIN SISKIND, ARIEL A. HERNANDEZ, JOHN PATRICK ROGAN, JULIUS BRUCE CHIUSANO, IRVING HAROLD WEISS, CHESTER POTASH** or **RICHARD DAVID GAZIE**, or of any of the communication facilities

12

named in this Affidavit. In addition, I caused a search to be made of the Electronic Surveillance Indices of the Federal Bureau of Investigation and the Drug Enforcement Administration during the week of March 8, 1999 in order to determine whether previous applications have been made to intercept wire, oral or electronic communications of **JOHN MIRABILE, ANTHONY ESPERTI** and **JOSEPH SPITALERI**. These searches did not reveal any previous applications to intercept wire, oral or electronic communications of any of those persons, or for any of the communication facilities for which authorization is herein sought, other than the following:

27   On February 5, 1982, The Honorable James W. Kehoe, United States District Judge, Southern District of Florida, executed an order authorizing the interception of wire and oral communications of **ANTHONY RUGGIANO** and others occurring over electronic listening devices placed in the kitchen and Florida room of a single family home located at 1200 N.E. 205th Terrace, North Miami, Florida, and occurring over telephone number (305) 651-8728, a telephone subscribed to Harry Robinson and located at 1200 N.E. 205th Terrace, North Miami, Florida, for a period of thirty (30) days. On March 9, 1982, The Honorable James W. Kehoe executed an order authorizing an extension of time for the above-described interception of wire and oral communications for an additional thirty (30) day period.

<u>FACTS AND CIRCUMSTANCES</u>
<u>ESTABLISHING PROBABLE CAUSE</u>

<u>STRUCTURE OF THE LCN</u>

13

28    Based on my investigative training and experience, and the sources described below, I have learned the following information about the LCN, a nationwide secret criminal association, and the Gambino Crime Family:

A.    The LCN is the most powerful and sophisticated organized crime group in the United States.

B.    The LCN consists of approximately twenty-four separate organizational units, known as "families," functioning in different cities throughout the United States.

C.    The hierarchy of each LCN family is very rigidly structured in the form of a pyramid. At the top of the pyramid for each LCN family is the Boss. The second-in-command is known as the Underboss. Beneath the Underboss is the Consigliere, or counselor. The fourth highest rank in each LCN family's hierarchy is the position of Caporegima, often referred to simply as "Capo," "Captain" or "Skipper." Caporegime are supervisors over "crews," i.e., groups of Soldiers, the lowest ranking members of the LCN family. Finally, LCN members frequently have nonmember associates who operate under their direction.

D.    There are five LCN families operating in the New York metropolitan area. They are the Bonanno, Colombo, Gambino, Genovese, and Lucchese LCN families. Each of these families is involved in a wide variety of criminal activities including murder, arson, gambling, loansharking, extortion, labor racketeering, robbery, money laundering, and narcotics trafficking. The Miami/Fort Lauderdale area is considered an "open city" in which

14

any LCN family may operate without paying tribute to any other LCN family. Each of the five New York families has representatives in South Florida. In addition to the traditional LCN families, the Trafficante and DeCavalcante Families, along with Russian Organized Crime groups and representatives of the Sicilian mafia, operate in the South Florida area. Often members of these families will operate and invest together in business and/or illegal operations.

29    The Gambino LCN Family, with approximately 210 active and inactive members, is one of the largest and most powerful LCN families in the United States. In fact, previous investigations have revealed that the other LCN families in the New York area frequently seek advice from the Gambino Family. The Gambino LCN Family is presently involved in the construction trades and industries, the gas distribution business, solid and toxic waste transportation and disposal, control of restaurant and hotel industries, shipping and related marine services, as well as aspects of the pornography business. The family also engages in drug trafficking, and is involved in traditional racketeering activities, such as murder, gambling, loansharking, public corruption and obstruction of justice, among other racketeering offenses. Gambino LCN Family operations extend from New York throughout New Jersey, Connecticut, Florida and Nevada.

30    Salvatore Gravano, a/k/a "Sammy the Bull" was a member of the Gambino LCN family. In November 1991, Gravano entered into a plea agreement with the Government whereby he entered a plea of guilty in connection with his criminal activities as a member of

15

the Gambino LCN Family.  As part of this plea agreement, Gravano agreed to provide full, complete and truthful information to the Federal Government.  Gravano was ultimately sentenced in the United States District Court for the Eastern District of New York to a prison term of five (5) years in consideration for his testimony and information provided to the government.  The information which Gravano has provided to the government has been reliable.

31    Gravano has made a number of admissions, including his participation in numerous murders, loansharking and other crimes. Gravano testified in the RICO prosecution of Gambino Family Boss John Gotti, which resulted in a conviction.

32 In November 1991, Gravano was debriefed by Agents of the FBI.  During this debriefing, Gravano was questioned regarding his knowledge of ANTHONY TRENTACOSTA.   Gravano stated that ANTHONY TRENTACOSTA had been formally inducted into the Gambino LCN family and that TRENTACOSTA was a soldier in the Gambino family.

## CHRONOLOGICAL NARRATION OF CONFIDENTIAL SOURCE ACTIVITIES

### PROTECTED SOURCES

33    Louis Maione has provided information to Agents of the FBI concerning criminal activities in New York, South Florida, and the Atlanta, Georgia area since 1988.  Maione was operated by the Miami Division of the FBI from 1988 to 1991 and from 1994 to 1996. Maione was operated by the Atlanta Division of the FBI from 1991 to 1994.  Maione has provided information concerning members of organized crime and organized crime activities, such as bookmaking, loansharking, narcotics trafficking, and interstate transportation

16

of stolen property. All information provided by Maione has been shown to be reliable and, where possible, has been corroborated by consensual recordings, by information obtained from other confidential sources, and through independent investigations conducted by law enforcement agencies. Information provided by Maione has been previously utilized in three applications for orders authorizing the interception of wire, oral or electronic communications. The information provided by Maione has led to the indictment and conviction, in 1997, of two Gambino capos (including Nicholas Corozzo) and seven Gambino associates.

34    Maione has known ANTHONY TRENTACOSTA and ANTHONY RUGGIANO for approximately forty years, and has known FREDERICK MASSARO since 1983. Maione advised that ANTHONY RUGGIANO was inducted as a member of the Gambino family in 1979, and that ANTHONY TRENTACOSTA was inducted as a member of the Gambino family in April 1986, when John Gotti took over as the Gambino family boss. Prior to RUGGIANO's arrest in 1985, Maione was a close associate of RUGGIANO. Maione was with RUGGIANO at the time of RUGGIANO's arrest in Miami, Florida. Maione indicated that MASSARO is involved in a loansharking operation, as well as having a hidden ownership in Party Girls Adult Entertainment lounge located in Miami, Florida. Maione advised that, as a result of MASSARO's association with ANTHONY TRENTACOSTA, MASSARO is required to send a portion of his earnings from both legal and illegal activities to TRENTACOSTA.

35    On November 30, 1995, Maione met JOHN ROGAN at FREDERICK MASSARO's car lot, Morgan Sales and Leasing Company, 3997 West

17

Hallandale Beach Boulevard, Hallandale Beach, Florida. ROGAN was handling Ryder truck rentals at MASSARO's car lot. Maione indicated to ROGAN that he had stolen cigarettes and liquor to sell; in fact, the cigarettes and liquor had been purchased directly from the manufacturer by the FBI, but were provided to Maione for him to offer as stolen merchandise as part of an undercover investigation. ROGAN indicated that he was interested in purchasing the purportedly stolen cigarettes and liquor from Maione.

36   On December 12, 1995, Maione met JOHN PATRICK ROGAN at ROGAN'S residence, 1945 Alamanda Drive, North Miami, Florida, at which time Maione sold 360 cartons of purportedly stolen cigarettes to ROGAN.   This transaction was consensually tape recorded and observed by FBI agents.

37   On February 24, 1996, Anthony Ruggiano Jr. told Maione that he had recently spoken with his father, ANTHONY "FAT ANDY" RUGGIANO, who stated that he had heard that "the little guy" (which I believe to be a reference to Nicholas Corozzo) had "taken over" the Gambino Family.   During conversations which occurred during March and April of 1996, Corozzo advised Maione that he was going to be the Boss of the Gambino Family, and that a majority of the Caporegime wanted Corozzo to replace the Acting Boss John Gotti, Jr., who had been appointed by his father, John Gotti.   Corozzo also discussed with Maione Corozzo's participation in loansharking, interstate transportation of stolen property, and other criminal

18

activities in which Corozzo had been involved during the previous ten years.

38   On March 13, 1996, Maione met Nicholas Corozzo at the Sonesta Beach Resort, Key Biscayne, Florida. According to Maione, Corozzo provided him with the following information: FREDERICK MASSARO had picked up Corozzo and Ralph Davino, a Gambino associate, at the airport and transported them to the hotel. Corozzo had questioned MASSARO concerning the activities in which MASSARO was currently involved in the South Florida area. MASSARO implied that he was not earning any money. Corozzo stated that MASSARO was lying, and that Corozzo had heard that MASSARO owned half of South Florida. MASSARO told Corozzo that he was selling Party Girls Nude Nightclub for approximately $250,000. Corozzo asked MASSARO how much money MASSARO was sending to Corozzo's brother, Joseph Corozzo, a Gambino capo and close associate of ANTHONY RUGGIANO. MASSARO told Nicholas Corozzo that he was sending Joseph Corozzo $500 per week. Nicholas Corozzo instructed MASSARO to immediately travel to New York and to contact Joseph Corozzo regarding the amount which MASSARO should be paying per week.

39   According to Maione, on March 13, 1996, at the same meeting described above, Nicholas Corozzo advised Maione of the following additional information:  Corozzo did not like ANTHONY TRENTACOSTA, and stated that if Corozzo was the boss years ago, he never would have allowed TRENTACOSTA to leave New York. Corozzo complained that TRENTACOSTA was all over the place, indicating

19

TRENTACOSTA's influence and control in New York, in Atlanta, Georgia, and in South Florida. Corozzo advised that TRENTACOSTA made a "ton" of money in the oil business with Anthony Morelli, an incarcerated Gambino Capo. TRENTACOSTA was supposed to pay $100,000 toward Morelli's legal fees, and Corozzo had to sit down with TRENTACOSTA just to get $25,000 out of him.

40 On March 15, 1996, Nicholas Corozzo advised Maione that Corozzo was taking MASSARO away from ANTHONY RUGGIANO's crew and placing MASSARO in the crew of TRENTACOSTA. Maione told Corozzo that RUGGIANO would not be happy about this change, to which Corozzo replied that he (Corozzo) was the boss, and that they would take care of RUGGIANO when he got out of prison.

41 On March 18, 1996, Maione met Nicholas Corozzo, ANTHONY TRENTACOSTA and several other Gambino members and associates at the Fountainbleau Hilton Hotel, Miami Beach, Florida. This meeting was directly observed by agents of the FBI. According to Maione, he obtained the following information during this meeting: TRENTACOSTA was told by Corozzo that TRENTACOSTA had to either spend more time in Florida working for the "Family" or stay retired in Georgia. Corozzo told Maione that TRENTACOSTA indicated his intent to have a more active role in South Florida. Corozzo told Maione that TRENTACOSTA had to be respected because he "did his work" (which I believe was a reference to TRENTACOSTA having previously been involved in the commission of a murder for the LCN).

20

42   On March 20, 1996, Maione met FREDERICK MASSARO at the Fountainbleau Hilton Hotel, Miami Beach, Florida.   According to Maione, MASSARO was at the Hotel to assist in transporting Nicholas Corozzo, Leonard DiMaria (a Gambino capo), and their wives to the airport for their return flight to New York.

43   Robert Joseph Engel was a co-defendant with Nicholas Corozzo in a federal racketeering case prosecuted in the Southern District of Florida in 1997.   Engel entered into a plea agreement with the government which provided that he give full, complete and truthful information regarding criminal activity.   Engel was sentenced in the United States District Court for the Southern District of Florida to a prison term of two (2) years in consideration for his testimony and information provided to the government.   The information which Engel has provided has proven reliable.

44   Robert Engel advised that he has known FREDERICK MASSARO, ANTHONY RUGGIANO and ANTHONY TRENTACOSTA for at least twenty years. When Engel lived in the South Florida area in 1994 and 1995, Engel would see MASSARO at least once every two weeks at MASSARO's car lot.   Nicholas Corozzo instructed MASSARO to sell a car to Engel in 1994. Engel first met MASSARO in the 1970s when Engel accompanied Anthony Ruggiano Jr. to Miami, Florida.   MASSARO was operating the Newport Hotel located on Collins Avenue and Sunny Isles Boulevard, Miami, Florida.   MASSARO arranged for Engel and Ruggiano Jr. to stay at the Castaways Hotel across the street from the Newport Hotel. Ruggiano Jr. told Engel that MASSARO was "with" his father,

21

ANTHONY RUGGIANO and Anthony "Tony Lee" Guerreri (a Gambino soldier), and that MASSARO's main source of income was from loansharking. I know, based upon my training and experience, that, in the parlance of the LCN, for an individual to be "with" a made member means that individual is under the protection of that member and that, in turn, the member receives a share of the profits which that individual realizes from criminal activity. Engel met John Porcaro on two occasions. Once Anthony Ruggiano Jr. introduced Engel to Porcaro, and the other time Engel met Porcaro through TRENTACOSTA. Anthony Ruggiano Jr. told Engel that Porcaro was a major drug dealer.

## CONFIDENTIAL SOURCES

45    **Confidential Source One** (hereinafter referred to as "CS-1")[1] came to the FBI within the past nine months to provided information concerning the criminal activities and associations of FREDERICK MASSARO, MICHAEL J. FALCO, MARTIN SISKIND, ARIEL A. HERNANDEZ, and JOHN PATRICK ROGAN. CS-1 came to the FBI to assist in this investigation as a result of his guilty plea for credit card fraud, which he committed with other LCN associates. CS-1 is providing assistance to the FBI in the hope of obtaining a possible reduction in his sentence.

46    CS-1 advised that he has been associated with numerous organized crime members and associates from several different LCN

---

[1] In order to protect the identities of the confidential sources of information relied upon herein, all references are in the masculine gender.

families over the past 10 - 15 years. The information provided by CS-1, where possible, has been corroborated by information obtained from other confidential sources, consensually recorded conversations, and from independent investigations conducted by law enforcement agencies.

47    CS-1 advised that John Porcaro, the owner of the Father and Son Moving and Storage ("FSMS"), frequented a restaurant named Locatellies (which has been renamed Beachside Mario's) located at 17210 Collins Ave, North Miami Beach, Florida, and that Porcaro reported directly to ANTHONY TRENTACOSTA. TRENTACOSTA received a large percentage of tribute from Porcaro.  Porcaro was very close with TRENTACOSTA  as a "money earner".  CS-1 consensually recorded a conversation in September, 1998 during which MASSARO advised that he (MASSARO) worked for ANTHONY RUGGIANO.  During this conversation MASSARO remarked that everybody thinks MASSARO is with TRENTACOSTA, but that MASSARO  is in fact with RUGGIANO.  MASSARO told CS-1 that he (MASSARO) has been friends with TRENTACOSTA, and that MASSARO took care of TRENTACOSTA when TRENTACOSTA was sick.

48    CS-1 advised that Gambino associate MIKE FALCO was close to FREDERICK MASSARO.  CS-1 advised that FALCO resides in Hialeah, Florida and has telephone number (305) 364-7487.  CS-1 described FALCO as closely associated with MASSARO for several years and knew several criminal activities in which MASSARO was involved.  CS-1 advised that FALCO provided loanshark loans.  In September 1998, CS-1 paid off an outstanding loan which he had received from FALCO

23

in the amount of $3,000, on which he had been paying three points (3%) weekly.

49    CS-1 also advised that MASSARO has previously bragged about his connections to the Gambino LCN Family. MASSARO related that Gambino Boss John Gotti was on MASSARO's boat in Florida during the mysterious disappearance from New York of an individual who had accidentally run over Gotti's son.  I believe that this was a reference to Massaro providing an alibi for Gotti during the time that the aforesaid individual was allegedly kidnaped.  CS-1 advised that MASSARO is involved in numerous illegal activities, including loansharking and dealing in counterfeit checks. According to CS-1, MASSARO's son-in-law, JOHN ROGAN, is involved in trafficking drugs, including marijuana and cocaine.  CS-1 said ROGAN operates out of a bar in North Miami called Westley's, and that ROGAN's drug connection is a Dominican.  CS-1 has no direct knowledge of this activity by ROGAN other than what he has heard through associates.

50    CS-1 advised that another MASSARO associate is an individual named ARIEL HERNANDEZ, who handles the fraudulent identification and checks for MASSARO.  CS-1 said that HERNANDEZ has been with MASSARO for several years and is MASSARO's "do boy."

51    CS-1 advised that MASSARO had a contact with a check cashing establishment located on North Dixie Highway south of Oakland Park Boulevard near a five point intersection.  CS-1 further advised that MASSARO's contact at this check cashing establishment is an individual whom he knows only as BRUCE.  It is noted that the Checking Exchange, located at 2603 North Dixie

Highway, Wilton Manors, Florida, matches the location and description provided by CS-1. In addition, public records indicate that the President/Director of the Checking Exchange, Inc. is JULIUS BRUCE CHIUSANO, date of birth June 29, 1948.

52  **Confidential Source Two** (hereinafter referred to as "CS-2") recently came to the FBI to provided information regarding the criminal activities and associations of FREDERICK MASSARO, ANTHONY TRENTACOSTA, JOHN PATRICK ROGAN and others. CS-2 came to the FBI to assist in this investigation following his indictment on racketeering charges involving other members and associates of the Gambino LCN Family. CS-2 is providing assistance to the FBI with the hope of obtaining a reduction in his ultimate sentence. CS-2 advised that he has been associated with numerous organized crime members and associates from several different LCN families over the past 10 - 15 years. The information provided by CS-2, where possible, has been corroborated by information obtained from other confidential sources, consensually recorded conversations, and from independent investigations conducted by law enforcement agencies.

53  CS-2 advised that, within the last six months, he has established an association with MASSARO and TRENTACOSTA as a result of CS-2's relationship with other Gambino Family members and associates. CS-2 advised that he has learned through discussions with MASSARO and other individuals that MASSARO is involved in providing loanshark loans and making counterfeit checks and identifications. MASSARO advised CS-2 that he would assist in collecting any outstanding loans which were owed to CS-2. CS-2 has

had numerous consensually tape recorded conversations, both telephonically and in person, to support his statements concerning these criminal activities.

54    **Confidential Source Three** (hereinafter referred to as "CS-3") came to the FBI within the last two months to provided information concerning the criminal activities and associations of CHIUSANO, WEISS, POTASH and GAZIE. CS-3 came to the FBI after he became the victim of a usurious loan obtained from CHIUSANO, WEISS, POTASH and GAZIE. The information provided by CS-3, where possible, has been corroborated by information obtained from other confidential sources, consensually recorded conversations, and from independent investigations conducted by law enforcement agencies.

55    **Confidential Source Four** (hereinafter referred to as "CS-4"), who no longer is operated by the FBI, had known MASSARO in a business relationship for eight years. CS-4 came to the FBI after he became the victim of an aggravated assault which occurred at the hands of Michael Bilotti in the presence of MASSARO. MASSARO accused CS-4 of leaving MASSARO's business with records and monies belonging to MASSARO. CS-4 last provided information to the FBI in April 1997. MASSARO worked at Father and Son Moving and Storage, which CS-4 indicated was owned by John Porcaro. It was while MASSARO was working at Father and Son that CS-4 was introduced to ANTHONY TRENTACOSTA. TRENTACOSTA would frequently meet Porcaro and MASSARO at Father and Son. MASSARO had a conflict with Porcaro and left Father and Son Moving and Storage to open a used car business, Morgan Sales and Leasing, Inc., Hallandale Beach, Florida. CS-4

26

had observed MASSARO meeting with ANTHONY TRENTACOSTA, JOHN PATRICK ROGAN, Gambino capo Nicholas Corozzo and Gambino associate Ralph Davino at Morgan Sales and Leasing at various times prior to it closing in March 1997. CS-4 knew that MASSARO was associated with Party Girls Adult Entertainment Lounge located on Biscayne Blvd., Miami, Florida. CS-4 was aware that MASSARO was making loanshark loans to numerous individuals, and was present when loanshark loan payments were made to MASSARO. CS-4 had taken a $500 loan from MASSARO, which CS-4 quickly repaid to MASSARO along with $100 interest. CS-4 was also aware that JOHN PATRICK ROGAN was involved in loansharking operations and drug distribution.

56    Confidential Source Five (hereinafter referred to as "CS-5"), who no longer is operated by the FBI, came to the FBI as a result of his cooperation with a local law enforcement agency. CS-5 has proven to be unreliable and untrustworthy. Notwithstanding that fact, the information presented in this affidavit which is attributed to CS-5 is considered reliable because it is self- incriminating and it is consistent with CS-5's known method of operation. CS-5 has been known to have a reputation for conducting drug rip-offs. CS-5 provided information that in February 1996, Francis Last Name Unknown ("LNU"), a.k.a. Trigger, arranged a deal in which CS-5 would participate in the purchase of fifty pounds of marijuana. CS-5 and an associate went to a hotel located in the vicinity of 172nd Street and Collins Avenue, Miami, Florida and met with an unknown male. CS-5 and his associate stole the fifty pounds of marijuana. A short time after

the theft of marijuana, Gerry Barone, a known Bonanno Family associate, called CS-5 and advised CS-5 that the dealer they had just robbed worked for JOHN ROGAN.    Barone told CS-5 that, because of ROGAN's association with TRENTACOSTA, CS-5 should work it out with ROGAN.    CS-5 contacted ROGAN and arranged a meeting in Opa Locka, Florida, at which time ROGAN and CS-5 split the marijuana evenly.    ROGAN attempted to negotiate with CS-5 a $50,000 to $60,000 sale of Quaaludes.    CS-5 advised that ROGAN was also involved with filming pornographic movies in a warehouse located in the vicinity of 122nd street and Biscayne Boulevard, North Miami, Florida.    In addition, CS-5 stated that ROGAN was engaged in "bust-out" schemes whereby he established fraudulent companies to obtain credit and merchandise, whereupon he would subsequently close the companies and sell the merchandise for a profit.

57  John Porcaro, a long time associate of ANTHONY TRENTACOSTA and FREDERICK MASSARO, who was the owner and operator of Father and Son Moving and Storage and Trump Foreign Currency Exchange, has been listed as a missing person since June 14, 1998.  Investigation by the Hollywood Police Department has established that Porcaro's spouse notified MASSARO that Porcaro was missing.  MASSARO went to the Fort Lauderdale/Hollywood International Airport, retrieved Porcaro's automobile, and returned it to Porcaro's spouse.  Since Porcaro's disappearance, MASSARO has taken over the operation of Father and Son Moving and Storage and Trump Foreign Currency Exchange.  CS-1 advised that the word on the street is that Porcaro was killed as a result of his organized crime affiliations.  CS-1

28

advised that Porcaro reportedly owed a large sum of money to unknown people, and as a result had been killed.

58    CS-1 advised that, during early 1998, he heard that Porcaro had lost control of his company, Father and Son Moving and Storage Company ("FSMS") to Gambino associate FREDDY MASSARO. CS-1 was present when Porcaro was asked if he could assist someone with a residential move. Porcaro indicated that, if this person wanted a deal on the move, he would have to speak to MASSARO. Additionally CS-1 was present when MASSARO's close associate, MIKE FALCO, complained that MASSARO had muscled his way into a takeover of FSMS. CS-1 said he saw Porcaro approximately one week before his disappearance. Porcaro had mentioned his birthday was coming up, and he was planning on traveling to the "islands." CS-1 said he saw MASSARO after Porcaro had been missing for about a week, and that MASSARO told him that Porcaro was "gone." CS-1 indicated that Porcaro was probably just recovering from his weekend in the Bahamas fishing and celebrating, but MASSARO corrected him, stating, "No, he is gone, gone." CS-1 additionally heard from another associate, Leon LNU from New York, that Massaro had recently pulled a photograph of Porcaro from his pocket and shown it to him, indicating that Porcaro was gone.

59    During a consensually recorded telephone conversation on August 21, 1998, utilizing telephone number (305) 364-7487, MICHAEL FALCO advised CS-1 that ANTHONY TRENTACOSTA grabbed FREDERICK MASSARO by the throat and threatened MASSARO and MARTIN SISKIND if he (TRENTACOSTA) found out that MASSARO and SISKIND had

29

anything to do with the disappearance of John Porcaro. This was done in the Rascal House Restaurant, Sunny Isles, Florida. FALCO told CS-1 that it appears as if MASSARO knows something about Porcaro's disappearance.

60    On September 9, 1998, FREDERICK MASSARO discussed the disappearance of John Porcaro with CS-1 during a consensually recorded conversation. MASSARO advised that the more MASSARO talked with people, the more enemies he realizes Porcaro could have had. MASSARO advised that he (MASSARO) does not ever want to be in the public eye, and that he (MASSARO) never wants a reputation. MASSARO advised that this is where TONY PEP (TRENTACOSTA) takes the biggest hit. MASSARO said that he advised TRENTACOSTA to "pull up" Porcaro because Porcaro was having problems taking care of business. MASSARO said that TRENTACOSTA stated that Porcaro needs to enjoy his life. MASSARO confirmed the fact that TRENTACOSTA had confronted MASSARO and SISKIND in the Rascal House Restaurant.

61    On October 14, 1998, FREDERICK MASSARO told CS-1 that TONY PEP (ANTHONY TRENTACOSTA) was in town, and that MASSARO had given TRENTACOSTA his cellular telephone, (954) 224-7513, to use while TRENTACOSTA was in town.

## DOCUMENTATION OF TELEPHONE USE IN FURTHERANCE OF CRIMINAL ACTIVITY

### EXTORTIONATE COLLECTION OF CREDIT

62    During a consensually recorded telephone conversation on September 2, 1998, utilizing telephone number (305) 944-2929 (as advised by CS-1 and verified by telephone billing records),

FREDERICK MASSARO advised CS-1 that Joseph Spitaleri was supposed to see MASSARO on the previous day in order to pay $25,000.00. MASSARO advised that he (MASSARO) had a gun strapped to his leg and was prepared to hold the gun to Spitaleri's head.

63    During a consensually recorded telephone conversation on September 3, 1998, utilizing telephone number (954) 224-7513 (as verified by telephone billing records), FREDERICK MASSARO advised CS-1 that Joe Spitaleri had reached out for some people in Las Vegas. MASSARO said that a Captain named Jimmy from New York had come to see MASSARO. MASSARO said that he told the Captain that if Spitaleri did not pay MASSARO his money, MASSARO was going to kill Spitaleri. MASSARO advised that either MASSARO would get his money or Spitaleri would die. During this same conversation, MASSARO stated that he was not with TONY (which I believe to be a reference to ANTHONY TRENTACOSTA) as the people from Las Vegas believed.

64    During a consensually recorded telephone conversation on September 4, 1998, utilizing telephone number (954) 224-7513 (as advised by CS-1 and verified by telephone billing records), FREDERICK MASSARO advised CS-1 that Joe Spitaleri had contacted MASSARO and advised that Spitaleri would pay half the $25,000. MASSARO said that he told Spitaleri that he would have to pay the entire $25,000.

65    On September 9, 1998, during a consensually recorded conversation with CS-1, FREDERICK MASSARO discussed Joe Spitaleri's $25,000 debt. MASSARO advised that "they" (which I believe to be a reference to Joe Spitaleri and his Las Vegas contacts) would have

31

to take up the issue of the $25,000 debt with ANDY in New York (which I believe to be a reference to ANTHONY RUGGIANO). MASSARO rhetorically asked whether $25,000 was worth Spitaleri's life, and stated that Spitaleri was going to die.

66    On September 17, 1998, CS-1 consensually recorded a conversation with FREDERICK MASSARO. During this conversation, MASSARO indicated to CS-1 that he (MASSARO) put $5,000 "on the street" for MICHAEL FALCO in order that FALCO could collect $250 per week to pay his rent and have some extra money. I believe that this conversation relates to MASSARO's financing of an unlawful credit transaction for FALCO, with a weekly interest rate of five percent.

67    CS-1 advised that, on the evening of October 10, 1998, he telephonically contacted FREDERICK MASSARO at MASSARO's business, Beachside Mario's, 17210 Collins Ave, Sunny Isles, Florida, telephone number (305) 944-2929 (as verified by telephone records). During this recorded conversation, CS-1 asked whether MASSARO had any luck locating the whereabouts of Joseph F. Spitaleri a.k.a. "Joe Spit" regarding the $25,000. MASSARO said he was still looking for him, and commented to CS-1 that Spitaleri should come forward and pay his debt, stating that the longer he hid from MASSARO the worse it would be for Spitaleri. CS-1 advised that MASSARO was intent on killing Spitaleri if he does not repay on this debt.

68    During this same October 10, 1998 conversation, MASSARO indicated to CS-1 that Gambino soldier ANTHONY TRENTACOSTA was

32

currently in the South Florida area. MASSARO told CS-1 that TRENTACOSTA was using MASSARO's cell phone. MASSARO said he would try to get this phone back so that CS-1 could call him directly.

69    On October 15, 1998, FREDERICK MASSARO discussed Joseph Spitaleri's $25,000 debt with CS-1 during a recorded conversation. MASSARO advised that TONY PEP (TRENTACOSTA) was in town to sit down with LCN associates backing Spitaleri in order for MASSARO to collect on this debt.

70    On December 4, 1998, CS-2 consensually recorded a telephone conversation with MASSARO on target telephone number (954) 456-3020 (as advised by CS-2 and verified by pen register records). Utilizing three-way calling, MASSARO attempted to contact his associate BRUCE CHIUSANO at the Checking Exchange to make an introduction for CS-2. CS-2 was attempting to seek employment as a clerk at the Checking Exchange. MASSARO was directed to contact BRUCE on cellular telephone number (305) 798-6442. Utilizing three-way calling, MASSARO attempted a call to CHIUSANO's cellular telephone but was unsuccessful.

71    On December 7, 1998, CS-2 consensually recorded a telephone conversation with MASSARO on target telephone number (954) 456-3020 (as advised by CS-2 and verified by pen register records). Utilizing three-way calling, MASSARO called the Checking Exchange and spoke with IRVING HAROLD WEISS. MASSARO advised that he was leaving town, and instructed WEISS to arrange for CS-2 to talk to BRUCE (BRUCE CHIUSANO). WEISS advised MASSARO to have CS-2 go to the Checking Exchange the following day at 10:00 A.M. WEISS

33

began to have a conversation with MASSARO, but abruptly terminated it when he realized that CS-2 was still on the line. MASSARO told WEISS that he would call him back. Pen register records indicate that, immediately following the termination of this telephone call between MASSARO and CS-2, a call was placed from target telephone number (954) 456-3020 to the Checking Exchange. Based upon the information provided by CS-3, that the Checking Exchange is being used to facilitate a loansharking operation, I believe that the purpose of the second call from telephone number (954) 456-3020 to the Checking Exchange was for MASSARO to discuss the criminal activity occurring at that location.

72    On January 26, 1999, CS-2 consensually recorded a telephone conversation with MASSARO on target telephone number (954) 224-7512 (as advised by CS-2 and verified by pen register records). During this conversation, CS-2 indicated that he would be going to see Allan Cohen and that maybe CS-2 would have some information for MASSARO. MASSARO advised that he (MASSARO) was really upset, that he (MASSARO) has waited a long time, and that he (MASSARO) needed his money. Agents of the FBI were advised by CS-2 that, based upon prior conversations in which CS-2 had engaged with both Cohen and MASSARO, CS-2 was aware that Cohen had an outstanding loan which he owed to MASSARO.

73    On January 27, 1999, CS-2 met with Allan Cohen and had a consensually recorded conversation. During this conversation, Cohen indicated that he had obtained a $40,000 loan from MASSARO at a weekly interest rate of 3 percent. Cohen advised that he had

34

paid MASSARO back approximately $32,000 but because MASSARO did not pay Cohen for his work at MASSARO's automobile dealership, Cohen was not paying the remaining $8,000.

74   On January 28, 1999, CS-2 consensually recorded a telephone conversation with MASSARO on target telephone number (305) 944-2929 (as advised by CS-2 and verified by pen register records). During this conversation, CS-2 relayed to MASSARO the conversation CS-2 had with Cohen. MASSARO advised CS-2 that, in addition to the outstanding balance, Cohen owed MASSARO interest because Cohen "borrowed" the money. MASSARO advised CS-2 that he (MASSARO) was going to go with a couple guys and break Cohen's head.

75   On February 2, 1999, CS-2 called Allan Cohen and had a consensually recorded conversation. During this conversation, CS-2 asked Cohen if he did anything for MASSARO. Cohen advised that MASSARO knows the truth and so does TONY PEP (ANTHONY TRENTACOSTA). CS-2 advised that he (CS-2) did not want MASSARO to send anybody to Cohen (to collect payment). Cohen advised that would be MASSARO's worst mistake. I believe that, during this conversation, Cohen was advising that he didn't presently owe anything to MASSARO, and that TRENTACOSTA was aware of that fact.

76   On February 2, 1999, CS-2 consensually recorded a telephone conversation with MASSARO on target telephone number (954) 224-7512 (as verified by pen register records). During this conversation, MASSARO asked CS-2 where Cohen worked and who was Cohen's co-worker at Toyota. CS-2 advised that the co-worker was

35

Bobby Lloyd.  CS-2 advised that he would attempt to get in contact with Lloyd.  MASSARO advised that he would claim the money owed by Cohen from Lloyd.

77  CS-3 advised that, in September 1998, CS-3 obtained a $10,000 loanshark loan at a weekly interest rate of 5 percent.  The loan quickly increased to a principal amount of $35,000 at 5 percent.  CS-3 had an outstanding principal loan balance of $62,500 at 3 percent weekly interest rate.  CS-3 advised that the subjects of the loansharking operation from which he had obtained this loan are **BRUCE CHIUSANO, IRVINE WEISS, CHESTER POTASH and RICHARD DAVID GAZIE** of the Checking Exchange, Wilton Manors, Florida.

78  On February 5, 1999, CS-3 consensually recorded a conversation with CHIUSANO at the Checking Exchange, at which time CS-3 made a $1,000.00 weekly interest payment.  CS-3 advised CHIUSANO that he (CS-3) was having economic difficulties, at which time CHIUSANO offered CS-3 a job in a "telephone room."  I believe that this latter reference was an offer by CHIUSANO to get CS-3 employment in some telemarketing operation.

### MAIL FRAUD and WIRE FRAUD

79  **Confidential Source Six** (hereinafter referred to as "CS-6") was employed at Trump Financial Group ("TFG") located at Loehmans' Plaza, Aventura, Florida.  The information provided by CS-6, where possible, has been corroborated by information obtained from other confidential sources and through independent investigations conducted by law enforcement agencies.  CS-6 provided information to the FBI as a result of his being released

investment was mailed to TFG by the victims, among other means of transmission. TFG did not invest or purchase any foreign currency, and pocketed the investor's total payment. June 1998 was a bad month for TFG insofar as some of the options should have earned interest due to extreme instability of the Japanese yen. This put TFG in jeopardy, because any interest paid out by TFG would have to have come from TFG's funds, since no legitimate investments into options had ever been made. In most cases, TFG would tell the investor that his funds were being moved into another option, which would eventually be lost.

82    While working at TFG, CS-6 observed an individual he knew as "TONY PEP" (ANTHONY TRENTACOSTA) come to the premises of TFG on several occasions in order to speak with John Porcaro and Michael Pontorno. CS-6 advised that, in late 1998, TFG changed its name to The Sheffield Group.

83    CS-1 provided the following information about an illegal boiler room lottery club named Beachsite EuroClub (BSU) which operated on AIA in North Miami Beach during 1997. This lottery room was started by Bonanno LCN associates Gerry Barone, a.k.a. "Little Gerry"; and Steven Maruca (recently deceased). Also associated with this club as a partner or manager was Julian LNU, Joseph Demarco and Anthony Truglia, both of whom are Gambino Family associates who report to Gambino soldier Augie Corrao. Corrao received a percentage of the proceeds from this lottery room through Truglia. Corrao is the brother of Gambino Capo Joe "Butch" Corrao.

84   CS-1 advised that many LCN associates and members would regularly meet at a Restaurant named Locatellies (renamed Beachside Mario's) located at 17210 Collins Ave, Miami Beach, Florida. This restaurant was later taken over and operated by FREDDY MASSARO. Gambino soldier David "Fat Dave" Iacovetti and Genovese Capo "Chinkie" Albert Facchiano regularly hung out at Locatellies (Beachside Mario's).

85   CS-1 contacted Porcaro's old business partner in the Trump Financial Group, Joseph F. Spitaleri. CS-1 said that Spitaleri and another individual named John Finkelstein, a Canadian who is trying to remain in this country, were the individuals who originally introduced Porcaro to the foreign exchange telemarketing business. The main person who has the most experience in these foreign exchange businesses is an individual named Chip Hostedler, who runs an office in the Savings of America Building located near Federal Highway and Commercial Blvd, Ft. Lauderdale, Florida. CS-1 said that Hostedler had taken John Porcaro to the Bahamas and showed him where the trading and clearing houses for the foreign exchanges were located. CS-1 advised that FREDERICK MASSARO has taken over the operation of Porcaro's financial exchange business. CS-1 advised that Trump Financial Group had changed its name to The Sheffield Group.

86   **Confidential Source Seven** (hereinafter referred to as "CS-7") came to the FBI in August, 1998 to assist in this investigation as a result of his guilty plea in a Florida state narcotics case. CS-7 is providing assistance to the FBI in hopes

of obtaining a possible reduction in his sentence. CS-7 advised that he has had business relationships with numerous organized crime members and associates from several different LCN families over the past 10 years. The information provided by CS-7, where possible, has been corroborated by information obtained from other confidential sources and through independent investigations conducted by law enforcement agencies. CS-7 advised that, through his association in a telemarketing lottery business known as the Euro Club International-Beach Site ("ECBS"), Collins Ave, North Miami Beach, Florida, he became acquainted with many LCN individuals. CS-7 advised that ECBS was run by Steve Maruca and Anthony Truglia, each of whom I know to be Gambino Family associates. CS-7 advised that an individual known only to him as "Augie - Crooked Neck" (which I believe to be a reference to Augustus Corrao, a Gambino LCN Family Soldier) would frequently come into ECBS and meet with Truglia in the back room. CS-7 described Truglia as Augie's man. On one occasion Augie came to ECBS and threatened one of the female employees, Irene Cohen, over a list of potential customers for ECBS which had been lost.

87    CS-7 advised that, when Maruca died in August of 1997, "the Mob" people from New York started frequenting ECBS and began to take over the business. CS-7 identified these individuals as Anthony Rabito (Bonanno soldier), Gerry Barone, and other individuals only known to him as Jimmy LNU.

88    CS-7 advised that, after the lottery boiler rooms were shut down by law enforcement authorities, several foreign monetary

40

exchange telemarketing companies, called FOREX companies, were set up in South Florida by many of the same individuals who had run the lottery rooms. CS-7 described the operation of the FOREX company as follow: Callers would sell options on the chance that the U.S. dollar would reach a certain value plateau, or a "strike level," against a specific foreign currency within a given time period. CS-7 advised that none of the FOREX companies actually pays off to these investors because the strike level is set so high that it could never be reached within the given time period.  CS-7 described one company named "FOREX" located at 2500 Hallandale Beach Blvd, Hallandale, Florida. The operators of "FOREX" were John Finkelstein and Joe LNU (believed to be Joseph F. Spitaleri).

89 In August, 1998, CS-7 described a branch office called Trump Financial Group located in the Loehman's Plaza area of Aventura, Florida. CS-7 described this office as a large money maker with weekly gross receipts of almost one million dollars from investors. CS-7 said this office advertized nationally and had advertisements on the E Channel. CS-7 said this office was set up by John Porcaro and managed by another individual. Porcaro had previously set up the "Club One" Florida Lottery telemarketing company. CS-7 said Porcaro was the owner of the Father and Son Moving and Storage Company, ("FSMS") located in South Florida. CS-7 further described Porcaro as "crooked eye" in that he had a bad eye. CS-7 said that Porcaro was sponsored by an individual named "Tony Pep," whom CS-7 described as being a member of the LCN.

90  CS-7 advised that, during approximately the first week of July 1998, he heard that Porcaro was "gone," which CS-7 interpreted to mean that he had been killed. When questioned further as to the reason for his death, CS-7 said he heard that Porcaro had an argument with a "Freddy" who wanted control over his FSMS company.

91    On November 20, 1998, CS-1 consensually recorded a telephone conversation with MASSARO on target telephone number (954) 224-7513 (as verified by telephone records).  CS-1 and MASSARO discussed the foreign currency exchange business. CS-1 asked MASSARO how Sheffield was doing.  MASSARO replied that they were holding their own.  During an unrelated conversation, MASSARO advised that Tony Black (Anthony Induisi, Colombo LCN Family Capo) was getting out soon (released from a halfway house).  MASSARO advised that he was going to see Induisi that night.


## FRAUDULENT ACTIVITIES IN CONNECTION WITH
## IDENTIFICATION DOCUMENTS AND ACCESS DEVICES

92    CS-1 advised, during August or September, 1998, that FREDERICK MASSARO and ARIEL HERNANDEZ obtain the names, addresses and bank accounts of victims from various sources.  They then make counterfeit checks from these names, which HERNANDEZ then uses to purchase computers, printers, fax machines and other expensive items which are, in turn, resold on the street.  CS-1 advised that HERNANDEZ can also make credit cards and false identifications. CS-

42

1 identified HERNANDEZ as a Hispanic male, approximately 35 years old, who lives at an unknown address in Hialeah.

93    On January 24, 1999, CS-2 consensually recorded a conversation with FREDERICK MASSARO at Beachside Mario's, 17210 Collins Avenue, Sunny Isles Beach, Florida.    During this conversation, CS-2 notified MASSARO that he had an individual who needed to negotiate some fraudulent checks, and that this individual would split 50/50 with whomever cashed the checks. MASSARO advised CS-2 that he (MASSARO) could make fraudulent checks on the computer at Beachside Mario's.    MASSARO stated that the way they do it, nobody gets burned.    CS-2 asked MASSARO about obtaining fraudulent identification.    MASSARO advised that he did not know if ARIEL (ARIEL A. HERNANDEZ) still was capable.    MASSARO advised that ARIEL had just gotten out of jail.

94    On January 26, 1999, CS-2 consensually recorded a telephone conversation with MASSARO on target telephone number (954) 224-7512 (as advised by CS-2 and verified by pen register records).    During this conversation, CS-2 cryptically asked if the checks could be made in any amount.    MASSARO advised that they could. During this conversation, CS-2 cryptically asked about the fraudulent identification.    MASSARO advised that all he needed was the information.

95    On January 28, 1999, CS-2 consensually recorded a telephone conversation with MASSARO on target telephone number (305) 944-2929 (as advised by CS-2 and verified by pen register records).    During this conversation CS-2 asked whether MASSARO had

43

found out anything about the identification. MASSARO stated that CS-2 needed to obtain two passport type photographs and give them to MASSARO with the information. MASSARO advised CS-2 that the identification could not be used. MASSARO said he would discuss it further when he met CS-2 in person.

96    On February 2, 1999, CS-2 consensually recorded a telephone conversation with MASSARO on target telephone number (954) 224-7512 (as verified by pen register records). During this conversation, CS-2 asked MASSARO the cost to purchase the fraudulent identification. MASSARO advised that each piece cost $250. MASSARO advised that it took three to four days to produce the identification.

### PEN REGISTER ANALYSIS

97    CS-1 advised that, from September, 1998 until the present time, he has had numerous telephone conversations with FREDERICK J. MASSARO over target telephone numbers (305) 944-2929 and (954) 224-7513 in order to discuss criminal activity. For example, MASSARO utilized the two target telephones to discuss, with CS-1, the extortionate collection of a $25,000.00 debt from Joseph F. Spitaleri. Many of these telephone conversations were consensually tape recorded. Toll records indicate that, from September 3, 1998 to September 8, 1998, four (4) telephone calls were registered between CS-1's cellular telephone and MASSARO's cellular telephone number (954) 224-7513.

98    Investigation has established that ANTHONY TRENTACOSTA has residential telephone number (770) 781-5262. Pen register

44

records indicate that, between October 1, 1998 and February 28, 1999, four (4) telephone calls were registered between telephone number (770) 781-5262 and MASSARO's residential telephone number, (954) 456-3020, the last call being registered on February 16, 1999. Pen register records indicate that, between October 1, 1998 and February 28, 1999, ninety (90) telephone calls were registered between telephone number (770) 781-5262 and MASSARO's cellular telephone number, (954) 224-7513, the last call being registered on February 27, 1999. Pen register records indicate that, between October 1, 1998 and February 28, 1999, one (1) telephone call was registered between telephone number (770) 781-5262 and MASSARO's cellular telephone number, (954) 224-7512, that call being registered on February 3, 1999.

99    Investigation has established that **ANTHONY TRENTACOSTA** utilizes cellular telephone number (770) 330-9057. Pen register records indicate that, between October 1, 1998 and February 28, 1999, eighty-nine (89) telephone calls were registered between telephone number (770) 330-9057 and MASSARO's cellular telephone number, (954) 224-7513, the last call being registered on February 27, 1999.

100    Investigation has established that **ANTHONY TRENTACOSTA** utilizes message service telephone number (800) 616-8118. Pen register records indicate that, between October 1, 1998 and February 28, 1999, six (6) telephone calls were registered between telephone number (800) 616-8118 and Beachside Mario's telephone number, (305) 944-2929, the last call being registered on February

45

23, 1999. Pen register records indicate that, between October 1, 1998 and February 28, 1999, five (5) telephone calls were registered between telephone number (800) 616-8118 and MASSARO's residential telephone number, (954) 456-3020, the last call being registered on February 23, 1999. Pen register records indicate that, between October 1, 1998 and February 28, 1999, one hundred and seventy-one (171) telephone calls were registered between telephone number (800) 616-8118 and MASSARO's cellular telephone number, (954) 224-7513, the last call being registered on February 26, 1999. Pen register records indicate that, between October 1, 1998 and February 16, 1999, five (5) telephone calls were registered between telephone number (800) 616-8118 and MASSARO's cellular telephone number, (954) 224-7512, the last call being registered on February 4, 1999.

101   CS-1 advised that **MARTIN SISKIND** (previously identified as an LCN associate of **FREDERICK J. MASSARO**) can be contacted on cellular telephone number (305) 785-3939. Pen register records indicate that, between October 1, 1998 and February 28, 1999, fifty-four (54) telephone calls were registered between telephone number (305) 785-3939 and Beachside Mario's telephone number, **(305) 944-2929**, the last call being registered on February 27, 1999. Pen register records indicate that, between October 1, 1998 and February 28, 1999, thirty-seven (37) telephone calls were registered between telephone number (305) 785-3939 and MASSARO's residential telephone number, **(954) 456-3020**, the last call being registered on February 24, 1998. Pen register records indicate that, between

46

October 1, 1998 and February 28, 1999, six (6) telephone calls were registered between telephone number (305) 785-3939 and MASSARO's cellular telephone number, (954) 224-7513, the last call being registered on November 22, 1998. Pen register records indicate that, between October 1, 1998 and February 28, 1999, nine (9) telephone calls were registered between telephone number (305) 785-3939 and MASSARO's cellular telephone number, (954) 224-7512, the last call being registered on February 11, 1999.

102  CS-1 advised that the residential telephone number for **MICHAEL FALCO** (previously identified as an LCN associate of **FREDERICK J. MASSARO**) is (305) 364-7487. Pen register records indicate that, between October 1, 1998 and February 28, 1999, seventy-three (73) telephone calls were registered between telephone number (305) 364-7487 and Beachside Mario's telephone number, (305) 944-2929, the last call being registered on February 27, 1999. Pen register records indicate that, between October 1, 1998 and February 28, 1999, sixty-eight (68) telephone calls were registered between telephone number (305) 364-7487 and MASSARO's residential telephone number, (954) 456-3020, the last call being registered on February 24, 1999. Pen register records indicate that, between October 1, 1998 and February 28, 1999, seven (7) telephone calls were registered between telephone number (305) 364-7487 and MASSARO's cellular telephone number, (954) 224-7513, the last call being registered on November 20, 1998. Pen register records indicate that, between October 1, 1998 and February 28, 1999, forty-one (41) telephone calls were registered between

47

telephone number (305) 364-7487 and MASSARO's cellular telephone number, **(954) 224-7512**, the last call being registered on February 16, 1999.

103  Investigation has established that **JOHN PATRICK ROGAN** manages Wesley's Sports Bar, 15346 West Dixie Highway, North Miami Beach, Florida, telephone number (305) 945-9053.  Pen register records indicate that, between October 1, 1998 and February 28, 1999, seven (7) telephone calls were registered between telephone number (305) 945-9053 and Beachside Mario's telephone number, **(305) 944-2929**, the last call being registered on February 19, 1999. Pen register records indicate that, between October 1, 1998 and February 16, 1999, eleven (11) telephone calls were registered between telephone number (305) 945-9053 and MASSARO's residential telephone number, **(954) 456-3020**, the last call being registered on February 19, 1999.  Pen register records indicate that, between October 1, 1998 and February 28, 1999, two (2) telephone calls were registered between telephone number (305) 945-9053 and MASSARO's cellular telephone number, **(954) 224-7513**, the last call being registered on November 22, 1998.  Pen register records indicate that, between October 1, 1998 and February 28, 1999, one (1) telephone call was registered between telephone number (305) 945-9053 and MASSARO's cellular telephone number, **(954) 224-7512**, that call being registered on February 8, 1999.

104  Investigation has established that **JOHN PATRICK ROGAN** has residential telephone number (305) 992-8803.  Pen register records indicate that, between October 1, 1998 and February 28, 1999,

48

twelve (12) telephone calls were registered between telephone number (305) 992-8803 and Beachside Mario's telephone number, **(305) 944-2929**, the last call being registered on February 14, 1999. Pen register records indicate that, between October 1, 1998 and February 28, 1999, fifteen (15) telephone calls were registered between telephone number (305) 992-8803 and MASSARO's residential telephone number, **(954) 456-3020**, the last call being registered on February 22, 1999.

105   CS-1 advised that Joseph F. Spitaleri (previously identified victim of extortionate credit transaction with **FREDERICK J. MASSARO**) has cellular telephone number (954) 295-2398. Pen register records indicate that, between October 1, 1998 and February 28, 1999, two (2) telephone calls were registered between telephone number (954) 295-2398 and Beachside Mario's telephone number, **(305) 944-2929**, the last call being registered on January 21, 1999.   Pen register records indicate that, between October 1, 1998 and February 28, 1999, seven (7) telephone calls were registered between telephone number (954) 295-2398 and MASSARO's residential telephone number, **(954) 456-3020**, the last call being registered on February 4, 1999. Pen register records indicate that, between October 1, 1998 and February 28, 1999, five (5) telephone calls were registered between telephone number (954) 295-2398 and MASSARO's cellular telephone number, **(954) 224-7513**, the last call being registered on November 27, 1998.   Pen register records indicate that, between October 1, 1998 and February 28, 1999, ten (10) telephone calls were registered between telephone number (954)

49

295-2398 and MASSARO's cellular telephone number, (954) 224-7512, the last call being registered on February 4, 1999.

106     Investigation has established that Anthony Esperti, a Colombo Family LCN associate, utilizes telephone number (954)442-5723. Pen register records indicate that, between October 1, 1998 and February 28, 1999, seventeen (17) telephone calls were registered between telephone number (954) 442-5723 and Beachside Mario's telephone number, (305) 944-2929, the last call being registered on January 28, 1999.     Pen register records indicate that, between October 1, 1998 and February 28, 1999, thirty-nine (39) telephone calls were registered between telephone number (954) 442-5723 and MASSARO's residential telephone number, (954) 456-3020, the last call being registered on February 28, 1999.     Pen register records indicate that, between October 1, 1998 and February 28, 1999, fourteen (14) telephone calls were registered between telephone number (954) 442-5723 and MASSARO's cellular telephone number, (954) 224-7513, the last call being registered on February 17, 1999.     Pen register records indicate that, between October 1, 1998 and February 28, 1999, seven (7) telephone calls were registered between telephone number (954) 442-5723 and MASSARO's cellular telephone number, (954) 224-7512, the last call being registered on February 17, 1999.

107     CS-3 advised that JULIUS BRUCE CHIUSANO (previously identified as an LCN associate of FREDERICK J. MASSARO) utilizes cellular telephone number (305) 798-6442. Pen register records indicate that, between October 1, 1998 and February 28, 1999,

50

eighteen (18) telephone calls were registered between telephone number (305) 798-6442 and Beachside Mario's, **(305) 944-2929**, the last call being registered on January 21, 1999.   Pen register records indicate that, between October 1, 1998 and February 28, 1999, eleven (11) telephone calls were registered between telephone number (305) 798-6442 and MASSARO's residential telephone number, **(954) 456-3020**, the last call being registered on February 20, 1999. Pen register records indicate that, between October 1, 1998 and February 28, 1999, eight (8) telephone calls were registered between telephone number (305) 798-6442 and MASSARO's cellular telephone number, **(954) 224-7513**, the last call being registered on November 27, 1998.   Pen register records indicate that, between October 1, 1998 and February 28, 1999, seven (7) telephone calls were registered between telephone number (305) 798-6442 and MASSARO's cellular telephone number, **(954) 224-7512**, the last call being registered on February 17, 1999.

108   CS-3 advised that **IRVING HAROLD WEISS** (previously identified as an LCN associate of **FREDERICK J. MASSARO**) utilizes cellular telephone number (305) 798-1903. Pen register records indicate that, between October 1, 1998 and February 28, 1999, three (3) telephone calls were registered between telephone number (305) 798-1903 and Beachside Mario's telephone number, **(305) 944-2929**, the last call being registered on January 19, 1999.   Pen register records indicate that, between October 1, 1998 and February 28, 1999, five (5) telephone calls were registered between telephone number (305) 798-1903 and MASSARO's residential telephone number,

(954) 456-3020, the last call being registered on December 2, 1998.
Pen register records indicate that, between October 1, 1998 and
February 28, 1999, three (3) telephone calls were registered
between telephone number (305) 798-1903 and MASSARO's cellular
telephone number, (954) 224-7512, the last call being registered on
January 19, 1999.

109    The advertised telephone number for Checking Exchange,
2603 North Dixie Highway, Wilton Manors, Florida, is (954) 567-
9898.  Pen register records indicate that, between October 1, 1998
and February 28, 1999, twenty-two (22) telephone calls were
registered between telephone number (954) 567-9898 and MASSARO's
residential telephone number, (954) 456-3020, the last call being
registered on February 19, 1999. Pen register records indicate
that, between October 1, 1998 and February 28, 1999, five (5)
telephone calls were registered between telephone number (954) 567-
9898 and MASSARO's cellular telephone number, (954) 224-7513, the
last call being registered on November 25, 1998.  Pen register
records indicate that, between October 1, 1998 and February 28,
1999, five (5) telephone calls were registered between telephone
number (954) 567-9898 and MASSARO's cellular telephone number,
(954) 224-7512, the last call being registered on February 26,
1999.

110    Subpoenaed cellular telephone records indicate that
cellular telephone number (917) 804-1117 is subscribed by John
Mirabile, a soldier in the Bonanno LCN Family.  Pen register
records indicate that, between October 1, 1998 and February 28,

52

1999, one (1) telephone call was registered between telephone number (917) 804-1117 and Beachside Mario's telephone number, (305) 944-2929, that call being registered on November 12, 1998. Pen register records indicate that, between October 1, 1998 and February 28, 1999, eight (8) telephone calls were registered between telephone number (917) 804-1117 and MASSARO's cellular telephone number, (954) 224-7513, the last call being registered on February 22, 1999.

## NORMAL INVESTIGATIVE TECHNIQUES

111   Your affiant is aware that an investigation consists of a number of techniques being used in conjunction with each other to develop enough evidence to establish a prosecutable case against all guilty individuals. These techniques include the use of undercover agents, confidential sources, the testimony of witnesses before the Federal Grand Jury, surveillance, analysis of toll and pen register data, and the execution of search warrants. The requested authorization for wire interception is necessary because these normal investigative techniques have been tried, and have not resulted in sufficient evidence to prosecute all the participants in the criminal enterprise. Furthermore, these techniques appear unlikely to produce the needed results if attempted or utilized further, or they are too dangerous, as described below.

112   Your affiant is aware that ANTHONY RUGGIANO and ANTHONY TRENTACOSTA are soldiers in the Gambino LCN crime family. Your affiant is also aware from prior investigations and reports of other agents that "made" members of LCN Crime families, such as

53

RUGGIANO and TRENTACOSTA, typically use LCN associates, such as FREDERICK MASSARO, MICHAEL J. FALCO, ARIEL A. HERNANDEZ, JOHN PATRICK ROGAN, JULIUS BRUCE CHIUSANO, IRVING HAROLD WEISS, CHESTER POTASH, and RICHARD DAVID GAZIE, as insulation between themselves and outsiders.   This buffer serves to protect the "made" member from direct dealings with undercover agents or confidential sources.

113     Your affiant is unaware of any undercover agents or cooperating witnesses who can infiltrate the conspiracy at a level high enough to identify all members of the conspiracy or otherwise satisfy all the goals of this investigation.

114     The use of confidential sources has been very valuable in developing information pertaining to **FREDERICK MASSARO, ANTHONY RUGGIANO, ANTHONY TRENTACOSTA, MICHAEL FALCO, ARIEL A. HERNANDEZ, JOHN PATRICK ROGAN, JULIUS BRUCE CHIUSANO, IRVING HAROLD WEISS, CHESTER POTASH,** and **RICHARD DAVID GAZIE,** and their criminal activities.   The cooperation of Maione, Engel, CS-1, CS-2, CS-3, CS-4, CS-5, CS-6 and CS-7 has significantly advanced the objectives of this investigation.   However, even though Maione and Engel are willing to testify, they are not in a position to provide complete and continued details regarding the activities of this criminal enterprise.

115     Maione and Engel have previously cooperated in the prosecution against Nicholas Corozzo, Leonard DiMaria, and seven co-defendants.   While Maione and Engel have known RUGGIANO, TRENTACOSTA, and MASSARO for many years, it has been several years

54

since they have had any criminal association with RUGGIANO, TRENTACOSTA or MASSARO.

116    Only CS-1, CS-2 and CS-3 have ongoing associations with some of the listed principal interceptees.  CS-4, CS-5, CS-6 and CS-7 are no longer available to work in an undercover capacity for the FBI, and are not known to have any current association with the listed interceptees.  None of the confidential sources possess complete access to all the listed interceptees.  Therefore, the confidential sources are not in a position to provide complete information regarding the criminal activities of those persons who comprise the enterprise under investigation herein.

117    Conducting physical surveillance of participants is a commonly used investigative technique.  Surveillance has been conducted in this investigation and has assisted in disclosing some of the associations and places of meetings by the participants. However, this technique has failed to reveal the identity of all the participants and has failed to provide sufficient admissible evidence of specific criminal activities.  Without knowledge of the content of these meetings, surveillance alone is of limited value. While surveillance can confirm the fact that a meeting took place, under most circumstances it cannot provide the content of the discussions which facilitate the organization's illegal activities. Moreover, your affiant knows that the subjects herein are particularly sensitive to efforts to surveille their activities. On at least one occasion, when ROGAN was being surveilled by law

55

enforcement agents, he actually confronted one of the agents who was following him.

118   Your affiant knows that any extensive surveillance risks exposure, and can compromise the covert nature of this investigation causing **FREDERICK J. MASSARO, ANTHONY RUGGIANO, ANTHONY TRENTACOSTA, MICHAEL J. FALCO, MARTIN SISKIND, ARIEL A. HERNANDEZ, JOHN PATRICK ROGAN, JULIUS BRUCE CHIUSANO, IRVING HAROLD WEISS, CHESTER POTASH, RICHARD DAVID GAZIE,** and their associates to alter and/or temporarily cease their criminal operations. Continued surveillance of the residences and businesses of the principals would jeopardize the covert nature of the ongoing investigation, causing the participants to be more cautious and secretive about their ongoing criminal activity. However, surveillance, in conjunction with the interception of relevant conversations, will provide valuable evidence regarding the activities of those involved in this criminal enterprise.

119   The possibility of initiating a Federal Grand Jury investigation at this time into the illegal activities of the principals of this investigation has been considered. However, many of the possible witnesses are conspirators themselves, and there are presently not sufficient facts to determine which of the alleged conspirators, if any, should be or could be compelled to testify under a grant of immunity. Individuals who are members and associates of organized crime families often invoke their Fifth Amendment testimonial privilege, and even under a grant of immunity have been known to risk and accept contempt charges rather than

56

testify.  From your affiant's experience, as well as that of other Agents of the FBI experienced in organized crime matters, extensive overt investigations would only result in the targets further camouflaging their activities, making detection even more difficult.

120    Consideration has been given to interviewing co-conspirators and associates of the principal subjects.  However, the individuals who are knowledgeable of the criminal activities are generally participants in the crimes, and are therefore unwilling to provide information and testify.  Even with the testimony of a co-conspirator, there would likely be insufficient evidence to successfully prosecute all co-conspirators or to develop usable information relating to the full scope of the federal violations set forth in this affidavit.  The co-conspirators, in addition to being afraid of physical retaliation, are often themselves prior participants or currently involved in illegal activity, and as such refuse to cooperate with law enforcement to any significant degree.  Even with the benefit of several key conspirators willing to testify, electronic surveillance is still necessary to accomplish successful prosecution because actual tape recordings of criminal conversations are usually necessary to corroborate testimony of witnesses with criminal backgrounds.

121    From prior investigations and reports of other Agents, your affiant knows that the Gambino LCN Crime family is extremely sophisticated in detecting and avoiding investigations by law

57

enforcement agencies. This has made conventional investigative techniques, such as interviews, of very limited value.

122    Based upon your affiant's experience and the experience of fellow agents who have investigated organized crime activity, your affiant believes that interviews of additional co-conspirators or victims in this matter would be communicated to the principals, their subordinates, or others, who would take even more precautionary measures to avoid the further collection of evidence by law enforcement. Moreover, it is your affiant's belief that interviews with co-conspirators at this stage of the investigation could jeopardize the safety of the confidential sources.

123    Telephone toll call records of telephones used by some of the known participants have been obtained. These records have been useful in revealing some of the associations and frequency of contact of the known participants with each other. However, these records, standing alone, do not provide proof of illegal activities because the records do not reveal the content of conversations. Pursuant to lawful court orders, pen registers and trap and trace techniques have been used in this investigation. As previously outlined in greater detail, the pen register information has revealed the existence of telephonic contact between the principals of this investigation, but like toll record information these records, standing alone, do not provide sufficient proof of illegal activities. The associations and frequency of contacts in themselves, do not provide evidence of criminal activity and do not identify the actual participants in the telephone contacts.

58

124    Based upon my experience, and the experiences of other law enforcement agents as related to me, it is my belief that use the of search warrants at this time would not provide sufficient evidence necessary to determine the full scope of the criminal conspiracies, the identity of all of the co-conspirators and the various methods used to run this criminal enterprise. Records concerning contacts between criminal associates are not normally kept, and the best evidence of a meeting would be the conversations themselves. Most such records are typically kept in a coded format, which is difficult to decipher absent the interception of relevant communications. Moreover, there is no corroborated information concerning the existence or location of any such records at this time.

125    Due to the fact that sufficient evidence is not available through other investigative techniques, as set forth above, your affiant believes there is a need for electronic surveillance in this matter to fully reveal the manner and scope in which FREDERICK J. MASSARO, ANTHONY RUGGIANO, ANTHONY TRENTACOSTA, MICHAEL J. FALCO, MARTIN SISKIND, ARIEL A. HERNANDEZ, JOHN PATRICK ROGAN, JULIUS BRUCE CHIUSANO, IRVING HAROLD WEISS, CHESTER POTASH, RICHARD DAVID GAZIE, the named interceptees, and others as yet unknown, are involved in the violations of federal statutes as set forth in paragraph 4 of this affidavit.

## MINIMIZATION

126    All interception will be minimized pursuant to Chapter 119 of Title 18, United States Code. Interception will be

59

suspended when it is determined through voice identification, physical surveillance, or otherwise, that none of the name interceptees or any of their confederates, when identified, are participants in the conversation, unless it is determined that the conversation is relevant to those matters under investigation. Even if one or more of the named interceptees or their confederates, when identified, is a participant in the conversation, monitoring will be suspended if the conversation is non-pertinent to those matters under investigation. Intermittent spot monitoring will be conducted to ensure that a minimized conversation has not become relevant.

### PERIOD OF INTERCEPTION

127 It is believed that the communications to be intercepted will reflect a continuing criminal conspiracy and continuing course of criminal activity, thereby necessitating the interception of communications on a continuing basis, following the first interception of communications that are the subject of this request. Therefore, it is requested that the interception not automatically terminate when incriminating communications are initially intercepted, but continue until communications are intercepted that reveal the full nature and manner in which FREDERICK J. MASSARO, ANTHONY RUGGIANO, ANTHONY TRENTACOSTA, MICHAEL J. FALCO, MARTIN SISKIND, ARIEL A. HERNANDEZ, JOHN PATRICK ROGAN, JULIUS BRUCE CHIUSANO, IRVING HAROLD WEISS, CHESTER POTASH, RICHARD DAVID GAZIE, and others as yet unknown, participate in the illegal conduct referenced herein, the identities of the

60

participants, co-conspirators, and victims, the precise nature and scope of the criminal enterprise and illegal activity, the individual acts committed by aiders, abettors, and co-conspirators, the extent of their participation in these offenses, their places of operation, the full nature of the criminal conspiracies involved therein, and the acquisition and disbursement of proceeds derived from criminal activity, or for a period not to exceed thirty (30) days, such thirty-day period to begin on the day on which the investigative or law enforcement officer first begins to conduct an interception under the Order, or, ten (10) days after the Order is entered, whichever is earlier.

Terry L. Feisthammel, Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me this 18 day of March, 1999.

WILLIAM P. DIMITROULEAS
UNITED STATES DISTRICT JUDGE

Certified to be a true and
correct copy of the original.
Carlos Juenke, Clerk
U.S District Court
Southern District of Florida
By _____
Deputy Clerk
Date 3/18/99

61