UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6273-CR-HUCK

NIGHT BOX
FILED

APR 1 6 2002

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

UNITED STATES OF AMERICA,

    Plaintiff,

-vs-

FREDERICK J. MASSARO,

    Defendant.
_____/

## GOVERNMENT'S RESPONSE TO THE DEFENDANT'S OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT AND MOTIONS FOR DOWNWARD DEPARTURE

COMES NOW the United States of America, by and through the undersigned Assistant United States Attorneys, and hereby files its Response to the defendant Frederick J. Massaro's Objections to the Presentence Investigation Report (hereinafter "PSR"), his Initial Motion for Downward Departure, and his Supplemental Motion for Downward Departure.

I.    *Introduction.*

On December 14, 2001, the jury returned guilty verdicts against defendant Frederick J. Massaro.[1] On March 26, 2002, defendant Massaro filed his Initial Objections to the Presentence

---

[1] Massaro was convicted on Count 1 (RICO Conspiracy - 18 USC 1962(d)), Counts 2-16 (Bank Fraud - 18 USC 1344), Count 17 (Conspiracy to Commit Murder in Aid of Racketeering - Jeanette Smith - 18 USC 1959(a)(5)), Count 18 (Murder in Aid of Racketeering - Jeanette Smith - 18 USC 1959(a)(1)), Count 20 (Conspiracy to Commit Murder in Aid of Racketeering - Ariel Hernandez - 18 USC 1959(a)(5)), Count 21 (Uttering Counterfeit Checks - 18 USC 513), Count 22 (Conspiracy to Make Extortionate Extensions of Credit - 18 USC 892(a)), Count 23 (Conspiracy to Participate in the Use of Extortionate Means to Collect Extensions of Credit - 18 USC 894(a)(1)) and Count 24 (Theft from Interstate Shipments - 18 USC 659).



Report and Initial Motion for Downward Departure. In these pleadings, the defendant essentially argues that he is simply not guilty of the offenses for which he was convicted. Massaro denies that he directed co-defendant Hernandez to produce counterfeit checks, notwithstanding his conviction for bank fraud and uttering counterfeit checks. The defendant denies that he had anything to do with the murder of Jeanette Smith, notwithstanding his conviction for conspiracy to commit murder and murder in connection with Ms. Smith's death. The defendant denies that he solicited Carlos Garcia and Francisco Valdez to murder Ariel Hernandez, notwithstanding his conviction for conspiracy to commit that very offense. To the extent that the defendant Massaro urges this Court to ignore the offenses of conviction, the Sentencing Guidelines command otherwise. See, USSG Sections 1B1.1 and 1B1.2 (Guidelines application required as to offense of conviction, defined as "the offense conduct charged in the count of the indictment ... of which the defendant was convicted," along with all relevant conduct under Section 1B1.3). On April 12, 2002, the defendant filed his Supplemental Motion for Downward Departure, urging that this Court depart downward in his sentence based upon his age and health condition and his allegedly "aberrant behavior" in the instant case.

    I.    *The defendant's conviction for murder in aid of racketeering carries a minimum mandatory sentence of life imprisonment.*

Title 18, United States Code, Section 1959(a)(1) provides that anyone convicted of murder in aid of racketeering "shall be punished ... by death or life imprisonment, or a fine under this title, or both." The Second Circuit has properly held that this provision constitutes a minimum mandatory sentence of life imprisonment, notwithstanding the defendant's Guidelines offense level. *United States v. James*, 239 F.3d 120, 127 (2d Cir. 2000). See, USSG Section 5G1.1(b) (where a statutorily required minimum sentence is greater than the maximum of the applicable guideline range, the

statutorily required minimum sentence shall be the guideline sentence). Moreover, under the Sentencing Guidelines, where (as here) the defendant has been convicted of premeditated murder, the base offense level is 43, which carries a Guidelines sentence of life imprisonment. See, USSG Section 2A1.1. Thus, pursuant to statute and the Guidelines, the only authorized sentence in the instant case is life imprisonment. Therefore, the aggravating offender and offense characteristics set forth in the PSR to which the defendant objects are merely academic considerations. They are nonetheless addressed below.

    II.    *The defendant Massaro warrants an increase based upon his aggravating role in the offenses.*

The defendant objects to a three level increase based upon his being a manager or supervisor of criminal activity. The evidence at trial established that, as a member of the Gambino Organized Crime Family of La Cosa Nostra (hereinafter "Gambino" or "Gambino Crime Family"), Anthony Trentacosta oversaw and profited from the criminal activities of the charged enterprise, the South Florida crew of the Gambino Crime Family (hereinafter "the crew"). Notwithstanding the fact that Trentacosta was not "formally" recognized within the Gambino Crime Family as Massaro's boss until the death of Anthony Ruggiano a/k/a "Fat Andy" (hereinafter "Fat Andy") on March 18, 1999, Trentacosta was Massaro's *de facto* boss, and was therefore directing the affairs of the enterprise, from at least the latter part of Fat Andy's incarceration[2] and throughout the time period from Fat Andy's release from prison up to and including the time of his death. As such, Trentacosta warrants a four level increase pursuant to USSG Section 3B1.1(a). The evidence established that this crew was run, on a day-to-day basis, by Massaro. Under Massaro's supervision and direction, the crew

---

    [2]    1984 through 1997.

conducted criminal activity in South Florida which included producing and uttering counterfeit checks, bank fraud, dealing in stolen merchandise, making and collecting unlawful extensions of credit, obstruction of justice and murder. Massaro arranged for the payment of "tribute" to Trentacosta in various forms, including but not limited to, checks disguised as "consulting fees" from Father & Son Moving of Jacksonville, Inc. to Denise Trezza (Trentacosta's wife) and by paying expenses on Trentacosta's behalf (including an apartment lease, cellular telephones, rental cars and airline tickets). Massaro was the direct nexus between the activities of the crew and the members of the Gambino Family. Further, the evidence at trial established that Massaro recruited the other members of the crew and directed them in conducting criminal activity. See, e.g., *United States v. Damico*, 99 F.3d 1431, 1438 (7th Cir. 1996) (in determining defendant's leadership role in a racketeering conspiracy, the court properly considers the defendant's role in the overall conspiracy, not just his role with respect to each underlying offense). That this criminal activity involved five or more participants or was otherwise extensive is beyond cavil. Therefore, the PSR appropriately assigns to Massaro a three level increase pursuant to USSG Section 3B1.1(b).

III.    *The defendant Massaro warrants an increase based upon obstruction of justice.*

The defendant objects to a two level increase based upon his having obstructed or impeded the administration of justice. Application Note 4 to USSG Section 3C1.1 provides that this increase is properly based upon conduct such as unlawfully attempting to influence a witness; committing perjury; destroying or concealing, or directing others to destroy or conceal, evidence; and providing false statements to law enforcement agents.[3]

---

[3]This list of examples set forth in Application Note 4 is specifically stated to be "non-exhaustive."

4

The uncontroverted evidence at trial established that, following the murder of Jeanette Smith, Massaro directed Adam Silverman to accompany Ariel Hernandez to the scene of the murder to collect and transport Ms. Smith's body. Thereupon, Massaro and Hernandez, along with Dominick Marchese, transported Ms. Smith's body to the Everglades, where it was dumped into the water. According to one of Hernandez' later statements, this was done in anticipation that the alligators would dispose of her remains. Massaro instructed Hernandez to get rid of Ms. Smith's personal property, and further instructed that the vehicle which had been used to transport Ms. Smith's body be thoroughly cleaned. Thereafter, Massaro sent Anthony Banks, Charles Monico and Joseph Maffei to the homicide scene, where they helped Hernandez cleaned up the room, disposed of linens and towels which presumptively would have contained incriminatory evidence, and moved Hernandez' property to a different location. During the time period between the murder and the arrest of Hernandez, Massaro obtained a false driver's license for Hernandez, for use by Hernandez in fleeing the jurisdiction. Massaro also disposed of the computer which had been utilized to produce the counterfeit checks. When it became apparent that Hernandez' complicity in the homicide would ultimately be established by the police, and would thus bring attention to Massaro's role in the homicide and his other ongoing criminal activities, Massaro plotted to murder Hernandez. On April 1, 1999, following Hernandez' arrest, Massaro met with detectives of the Broward Sheriff's Office and, during a sworn taped statement, provided materially false statements to them concerning his knowledge of the homicide and his and Hernandez' activities in connection therewith.[4] Massaro also

---

[4] During this sworn statement, Massaro stated, *inter alia*, that he only knew Hernandez from Hernandez' stopping by the restaurant, that Hernandez did no work for Massaro, that Hernandez never spoke to Massaro about the death of Jeanette Smith, and that Massaro was never requested by Hernandez to lend any assistance to him following the homicide. All of these statements were proven at trial to have been patently false.

5

spoke with Adam Silverman, and encouraged Silverman to lie to the police when he was questioned about the murder of Ms. Smith. Therefore, the PSR appropriately assigns to Massaro a two level increase pursuant to USSG Section 3C1.1.

> IV. *The defendant does not warrant a downward departure based upon his physical condition.*

The defendant seeks a downward departure from his determined guidelines range based upon his age and history of heart disease and diabetes. Significantly, according to the PSI Report, the defendant was suffering from heart disease and underwent bypass surgery in 1999, during the very same time frame that he was committing the crimes for which he is being sentenced. The evidence in this case establishes that, following his treatment, the defendant continued to engage in criminal activity. Consequently, if the defendant was well enough to engage in criminal activity notwithstanding his illness, then his illness cannot logically provide a basis to reduce his sentence. Furthermore, the defendant's physical condition does not even approach the threshold necessary to warrant a reduction.

USSG Sections 5H1.1 and 5H1.4 provide that neither age nor physical condition are ordinarily relevant in determining whether a sentence should be outside the applicable guideline range. These sections do provide that such a departure may be appropriate where a defendant is elderly and infirm or where there exists an extraordinary physical impairment and home confinement may be appropriate. A review of the law reveals that, in those rare cases where such a departure has been upheld, it has been under circumstances where a relatively brief period of incarceration was called for under the guidelines and where the defendant's affliction was such that it compromised his physical safety and/or was truly extraordinary. By contrast, in cases such as that at bar, departures

have been deemed inappropriate.[5]

In *United States v. Carey*, 895 F.2d 318 (7th Cir. 1990), the trial court departed from the sentencing guidelines range based upon the defendant's age (62 years) and the fact that he previously had several operations as a result of a brain tumor. The Seventh Circuit reversed, holding that those factors, standing alone, were insufficient to support a departure. In *United States v. Guajardo*, 950 F.2d 203 (5th Cir. 1991), the defendant (age 55) suffered from cancer which was in remission, high blood pressure, a fused right ankle, an amputated left leg and drug dependency. The court held that there was nothing so extraordinary about these circumstances as to warrant a departure. In *United States v. Tolson*, 706 F.Supp. 1322 (N.D.Ind. 1991), affirmed, 988 F.2d 1494 (7th Cir. 1993), the defendant (age 60) had uncontrollable rotting of the fingernails and toe nails, peripheral neuropathy, arthritis and emphysema. The court held that, notwithstanding these circumstances, the defendant was not entitled to a departure. See also, *United States v. Winters*, 105 F.3d 200 (5th Cir. 1997)

---

[5]The reported decisions cited by the defendant in his motion are unavailing. In *United States v. Slater*, 971 F.2d 626, 634 (10th Cir 1992), the defendant was suffering from borderline mental retardation, chronic major depressive disorder, spondylosis, and scoliosis of the spine. Further, the defendant had been judged totally disabled by the Social Security Administration, and had initially been found incompetent to stand trial due to his psychiatric condition. The district judge nonetheless denied the defendant's motion for a downward departure. In remanding the case for re-sentencing, the Circuit Court specifically held the following: "Our review is premised on the district court's belief it was without authority under 5H1.4 to depart from the guidelines, not its failure to do so." *Id.* Thus, the case was remanded to the trial court, without direction to grant the motion. In *United States v. Long*, 977 F.2d 1264, 1277 (8th Cir. 1992), the defendant, who had been convicted of money laundering, was suffering from some unspecified "extraordinary physical impairment" which compelled the trial court to reduce his sentence from a guidelines range of 46-57 months to five years' probation, one year home detention, a fine and community service. Significantly, the government on appeal did "not dispute the court's conclusion that extreme physical impairment resulting in exceeding vulnerability constitutes a legitimate basis for departure, nor does it challenge the extent of the departure." *Id.* Therefore, the issues presented in *Long* bear no relationship to those before the Court in the instant case.

7

(defendant suffering from sarcoidosis, a chronic inflammation of multiple organs, not entitled to departure); *United States v. McKinney*, 53 F.3d 664 (5th Cir. 1995) (52-year-old female defendant suffering from heart problems and high blood pressure, who had responsibility for her elderly mother, not entitled to departure); *United States v. Martinez-Guerrero*, 987 F.2d 618 (9th Cir. 1993) (defendant who was legally blind not entitled to departure); *United States v. Espinoza-Godinez*, 11 F.Supp.2d 1210 (D.Or. 1998) (defendant, who had both legs amputated and was suffering from Charcot-Marie-Tooth disease, a progressive neuropathic muscular atrophy, had not shown an extraordinary physical impairment so as to allow the court to depart).

Therefore, as set forth hereinabove, the appellate courts have been quite stringent when considering guidelines departures based upon age and health. The government submits that the age and health of the instant defendant are within the parameters of the ordinary case, there is nothing extraordinary about the defendant's current condition, and he has not exhibited, and cannot credibly exhibit, a basis upon which a downward departure can properly be granted. See, *United States v. Tucker*, 986 F.2d 278 (8th Cir. 1993).

V. *The defendant is not eligible for a downward departure based upon aberrant behavior.*

The defendant seeks a downward departure under USSG Section 5K2.20 based upon his purported "aberrant behavior" in the instant case. That Section of the Guidelines specifically and unequivocally prohibits the Court's granting such a departure in any case where "(1) the offense involved serious bodily injury or death," or "(4) the defendant has more than one criminal history point, as determined under chapter Four," or "(5) the defendant has a prior federal, or state, felony conviction, regardless of whether the conviction is countable under Chapter Four."

The instant case involves murder and a related conspiracy to commit murder for which the

defendant stands convicted. The defendant has two criminal history points and a criminal history category II. See, PSR, paragraph 97. The defendant has a prior state felony conviction. See, PSR, paragraph 95. Moreover, the defendant is currently awaiting trial for extortion in the Southern District of Florida, case no. 00-1085-CR-MORENO. Therefore, this Court is prohibited from granting such a departure.

Even were this Court not specifically prohibited from granting such a departure, it would nonetheless be inappropriate in the instant case. Application Note 1 of USSG Section 5K2.20 defines "aberrant behavior" as "a single criminal occurrence or single criminal transaction that (A) was committed without significant planning, (B) was of limited duration, and (C) represents a marked deviation by the defendant from an otherwise law-abiding life." In the case at bar, the defendant was convicted of a variety of serious offenses which occurred over a time span of six years. These offenses included fraud, loansharking, dealing in stolen property, and murder, all of which entailed significant planning. Moreover, the evidence at trial established that the defendant has been associated with the Gambino Crime Family throughout his adult life. Rather than constituting "aberrant behavior," the evidence at trial established that the crimes for which the defendant stands convicted constituted his usual way of doing business.[6]

VI. *Conclusion.*

WHEREFORE, for the reasons set forth above, the above-stated objections should be

---

[6]Parenthetically, USSG Section 5K2.1 provides that where, as here, a death resulted during the course of the defendant's conduct, "the court may increase the sentence above the authorized guideline range." In the instant case, given that the defendant faces a statutory minimum mandatory sentence of life imprisonment, and a guidelines sentence of life imprisonment, the government has not sought such an upward departure.

overruled and the defendants motions for downward departure should be denied.

Respectfully submitted,

GUY A. LEWIS
UNITED STATES ATTORNEY

By: _____
JEFFREY H. SLOMAN
Assistant United States Attorney
Florida Bar No. 378879
500 E. Broward Boulevard, Suite 700
Fort Lauderdale, Florida 33394
Telephone: (954) 356-7255x3576
Facsimile: (954) 346-7228

_____
LAWRENCE D. LaVECCHIO
Assistant United States Attorney
Florida Bar No. 0305405
500 E. Broward Boulevard, Suite 700
Fort Lauderdale, Florida 33394
Telephone: (954) 356-7255x3588
Facsimile: (954) 346-7230

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was delivered by United States mail this 16th day of April 2002 to:

Stephen H. Rosen, Esq. (Attorney for Anthony Trentacosta)
1221 Brickell Avenue, Ste. 1020
Miami, Florida 33131

Fred Haddad, Esq. (Attorney for Frederick J. Massaro)
One Financial Plaza, Suite 2612
Fort Lauderdale, Florida 33394

Jeffrey Weinkle, Esquire (Attorney for Ariel Hernandez)
1035 NW 11th Avenue
Miami, Florida 33136

Thomas E. Felasco, USPO
Room 315, U.S. Courthouse
300 N.E. 1st Avenue
Miami, Florida 33132

_____
LAWRENCE D. LaVECCHIO
Assistant United States Attorney